412 F.2d 233
 A. R. CARVER and A. R. Carver, as Executor of the Estate of Kate W. Carver, Deceased
v.
The UNITED STATES.
A. R. CARVER, as Alleged Transferee of Assets of Chase National Company, Inc.
v.
The UNITED STATES.
 No. 382-65.
 No. 383-65.
 United States Court of Claims.
 June 20, 1969.
 
 George W. Ericksen, Tampa, Fla., attorney of record, for plaintiff; Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., and Stanley W. Rosenkranz, Tampa, Fla., of counsel.
 Donald T. Fish, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 PER CURIAM:*
 
 
 1
 These cases were consolidated for trial, and at the trial the issue of liability was severed from the determination of the amount of recovery, if any.
 
 
 2
 It is our opinion that the plaintiff[1] is entitled to a partial recovery.
 
 
 3
 * In case No. 382-65, the plaintiff, A. R. Carver, sues as an individual taxpayer, and as executor of the estate of his deceased wife, Kate W. Carver (by reason of the filing of joint federal income tax returns by husband and wife during the years in question, 1955 and 1956).
 
 
 4
 In case No. 383-65, the same A. R. Carver is plaintiff, suing as the alleged transferee of assets of Chase National Company, Inc. (hereinafter referred to as Chase National). The years involved are 1954-1958.
 
 
 5
 Recovery is sought of the following amounts of income tax, penalties, and interest:
 
 
 6
 ______________________________________________________________________________
 Year Tax Penalties Interest Total
______________________________________________________________________________

Case No. 382-65:
 1955 .................... $32,797.50 ........... $12,668.56 $45,466.06
 1956 .................... 12,399.69 ........... 4,090.97 16,490.66
 ________________________________________________
 Total .................. 45,197.19 ............ 16,759.53 61,956.72
 ================================================
Case No. 383-65:
 1954 .................... 459.92 114.98 203.04 777.94
 1955 .................... 24,079.20 6,019.80 9,185.72 39,284.72
 1956 .................... 9,111.11 2,277.78 2,929.03 14,317.92
 1957 .................... 1,612.53 403.13 421.65 2,437.31
 1958 .................... 913.97 228.49 184.14 1,326.60
 ________________________________________________
 Total ................ 36,176.73 9,044.18 12,923.58 58,144.49
 ================================================
 Combined total ....... 81,373.92 9,044.18 29,683.11 120,101.21
______________________________________________________________________________
 
 
 7
 Chase National was incorporated under the laws of Florida in 1925. Mr. Carver was one of the incorporators. Its purpose was to obtain financing for the construction of a combination bank and office building in Lakeland, Florida. Upon deterioration of economic conditions, the original plan was abandoned. Four years later the other incorporators assigned their stock subscription rights to Mr. Carver. Thereafter, from 1929 into 1957, he used the corporate name in a variety of transactions related to his law practice and personal investments in real estate and real estate mortgages.
 
 
 8
 Throughout the period of Mr. Carver's use of Chase National, the corporation was in reality a mere shell. The issuance by the State of Florida of a corporate charter gave it status as a legal entity, but no stock certificates were issued, no directors or officers were elected, no books were kept, and no federal tax returns were filed.
 
 
 9
 On June 15, 1957, all real property with record title in Chase National, and all notes, claims, liens, leases, and mortgages shown of record to be in the name of Chase National were formally conveyed to Mr. Carver. On April 29, 1960, the corporation was officially dissolved by proclamation of the Governor for failure to pay the state capital stock tax.
 
 
 10
 The parties have agreed to the following statement (as contained in the next succeeding paragraph) of the position of the Commissioner of Internal Revenue in assessing the taxes for which plaintiff is suing, although plaintiff does not accept the contents of the statement as factually accurate in relation to Chase National.
 
 
 11
 With respect to the calendar years 1954-1958 (earlier years were barred by the statute of limitations), the Commissioner of Internal Revenue determined that Chase National was an active business corporation engaged in real property and loan transactions. As such, he determined that Chase National should have reported as taxable income or loss any gains or losses from the sale of real property in its name and any interest income received from borrowers, excepting certain transactions carried out in the name of Chase National by Mr. Carver for his clients (as to which no taxes were assessed).
 
 
 12
 The Commissioner assessed income tax deficiences (plus interest) against Mr. and Mrs. Carver as recipients of dividend income from Chase National in the amounts that he was treating as income to Chase National. These amounts had been paid either directly or indirectly (through a bank account listed in the name of Chase National) to the Carvers during the years 1954, 1955, and 1956. By way of offset, the Commissioner recognized that the Carvers had previously reported this income (from interest and on gains and losses from the sale of the real estate) on their joint federal income tax returns. The income tax deficiencies and interest assessed against the Carvers were as follows:
 
 
 13
 _______________________________________________________________________
 Year Income tax Interest Total
_______________________________________________________________________

1954 ................... $ 133.10 $ 31.94 $ 165.04
1955 ................... 32,797.50 12,668.56 45,466.06
1956 ................... 12,399.69 4,090.97 16,490.66
 ____________________________________________
 Total .............. 45,330.29 16,791.47 62,121.76
_______________________________________________________________________
 
 
 14
 The Commissioner also assessed income tax deficiencies (plus interest and penalties for failure to file returns) against Mr. Carver as transferee of Chase National's assets in the following amounts:
 
 
 15
 _______________________________________________________________________
 Year Income tax Penalties Interest Total
_______________________________________________________________________

1954 .......... $ 459.92 $ 114.98 $ 203.04 $ 777.94
1955 .......... 24,079.20 6,019.80 9,185.72 39,284.72
1956 .......... 9,111.11 2,277.78 2,929.03 14,317.92
1957 .......... 1,612.53 403.13 421.65 2,437.31
1958 .......... 913.97 228.49 184.14 1,326.60
 ____________________________________________________
 Total ..... 36,176.73 9,044.18 12,923.58 58,144.49
_______________________________________________________________________
 
 
 16
 Because of various adjustments not here in issue, overassessments resulted in 1957 and 1958 in the amounts of $100.82 and $258.75, respectively.
 
 
 17
 All assessed amounts were paid. Timely claims for refund were filed (except for the amount of $165.04 assessed against Mr. and Mrs. Carver for the year 1954). The claims for refund were denied, and the present actions were timely instituted for the claimed amounts, plus interest.
 
 II
 
 18
 Defendant contends (1) that the activities of Chase National and the purposes underlying Mr. Carver's use thereof warranted its being taxed as a viable corporate entity; (2) that Mr. Carver's receipt of Chase National's property in liquidation warranted his being treated as a transferee of assets of the corporation, so that its unpaid tax obligations could be collected from him; and (3) that amounts received by Mr. Carver from proceeds of sales and loan transactions by Chase National constituted constructive dividend income to him from Chase National.
 
 
 19
 Plaintiff asserts that under Florida law Chase National, during its entire existence, never owned any assets and was never in receipt of income, earnings, or profits.
 
 
 20
 The threshold issue, therefore, is whether or not the Commissioner of Internal Revenue was warranted in treating Chase National as a viable, taxable, corporate entity.
 
 
 21
 For the proposition that the Commissioner was so warranted, defendant relies on the landmark case of Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) and a line of cases resting thereon.[2]
 
 
 22
 The corporation in Moline was organized as a security device in the purchase of real property, with control of it in the lender. When the debt was paid, the stock reverted to the individual who had organized the corporation, and he continued it to hold title to the real estate. No books were kept by the corporation and it had no bank account. Following payment of the debt and the reverter of the stock, the corporation (1) refinanced the mortgage, (2) leased a portion of the property for a parking lot, and (3) ultimately sold the property for a substantial gain. The corporation contended that the gain was taxable to the sole stockholder and not to the corporation. The court rejected its contentions of alter ego and agency[3] and held the gain taxable to the corporation.
 
 
 23
 Defendant submits that, as specifically stated in Moline, and as confirmed by the other cases cited, the corporate entity must be recognized for tax purposes where either (1) the corporation was formed for business purposes, or (2) its creation is followed by the carrying on of business activity. Moline also refers to the "equivalent of business activity," in the following quotation:[4]
 
 
 24
 The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.
 
 
 25
 The fact that the business purposes for which Chase National was organized were abandoned is immaterial, as defendant says. And as for Chase National being a "shell" or "dummy" corporation, defendant cites the language of this court in the Love case, supra:[5]
 
 
 26
 That a corporation is regarded as a "straw," a "dummy," a "phantom," in itself proves nothing. The concept of the corporation is itself a fiction. A corporation is an artificial person. It operates under a charter granted it by the state, conferring certain rights, and also conferring certain privileges and exemptions in return for complying with certain rules or conditions. The decision to recognize or not to recognize the tax identity of a corporation depends upon what the corporation does, not what it is called, how many or how few own it, or how they regard it. Whether much or little use was made by plaintiffs of the Leado corporation, it was available to them at all times, like the musket behind the door, for use when needed or when occasion should arise. We hold that they did in fact use it to such an extent that its separate identity must be recognized.
 
 
 27
 Defendant emphasizes the extent of the use of Chase National by Mr. Carver as showing that it "was a most active corporation," as indeed it was:
 
 
 28
 * * * At the very least, Chase National bought and sold real property, borrowed money, lent money, maintained two bank accounts, made improvements to property titled in its name, instituted litigation, paid commissions on sales of property and for collecting rents, sold timber and citrus off of its properties and entered into contracts to convey property, deeds, leases, options, notes, mortgages, and satisfactions of mortgages.
 
 
 29
 "These facts alone," defendant's brief continues, "are enough to require the conclusion that the corporation was a taxable entity."
 
 III
 
 30
 Plaintiff's brief develops three lines of argument: (1) That the Moline decision has no application to the facts of the present case because the Commissioner of Internal Revenue taxed Chase National only to the extent of the beneficial interests of the Carvers, making no pretense of treating the corporation as a viable, taxable entity for all of its transactions; (2) that in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property; and (3) that under relevant Florida law, Chase National had no property interest whatever, either in land, money, or choses in action.
 
 
 31
 Whether or not the Commissioner was warranted in limiting the effect of the Moline doctrine to the beneficial interests of the Carvers and excluding from taxation transactions carried out for clients is discussed in a later section of this opinion.
 
 
 32
 In support of his second point, plaintiff cites a line of cases[6] holding that when Congress makes the application of a federal revenue act depend upon property rights created by the individual states, the actual incidents of ownership are determined by reference to state law. Following is a quotation from one of the Supreme Court decisions so cited:[7]
 
 
 33
 * * * It would indeed be anomalous to say that the taxpayer's "property and rights to property" included property in which, under the relevant state law, he had no property interest at all.
 
 
 34
 So saying, the main thrust of plaintiff's case is his contention that Chase National was at all times the holder of mere naked record title, with neither legal nor equitable ownership of property. Lack of ownership, legal or equitable, is the predicate of his argument that Chase National's receipts did not constitute corporate earnings or profits, and that its holdings (real estate titles, notes, mortgages, or bank balances) were not corporate assets.
 
 Plaintiff's brief asserts:
 
 35
 The law in Florida is clear and unequivocal. Where a dry, passive trust of property has been created, the Florida Statute of Uses, Florida Statutes, § 689.09, has been held to nullify the trust and to vest both the legal and equitable title in the designated beneficiary or beneficiaries. Hamilton v. Flowers [134 Fla. 328], 183 So. 811 (Fla.1938); Elvins v. Seestedt [141 Fla. 266], 193 So. 54 [126 A.L.R. 1001] (Fla.1940); McGriff v. McGill, 62 So.2d 28 (Fla.1952); Baum v. Corn, 167 So.2d 740 (2d D.C.A.Fla. 1964).[8]
 
 
 36
 On this point, Trial Commissioner Evans said in his opinion: "Careful analysis, including a review of the origin and development of the statute of 27 Henry VIII (which is the Statute of Uses of common law derivation in the American states), has convinced the writer that the foregoing statement from plaintiff's brief is an accurate assessment of Florida law.
 
 
 37
 "The Florida statute of uses executes the use of a dry or passive trust. Consequently, a conveyance of land to Chase National passed the legal as well as the equitable title to the beneficial owner. Chase National held the mere naked legal title of record. The use does not have to be expressed, although it can generally be inferred, technically, from the bargain and sale. Florida law, as illustrated by the cases cited in plaintiff's brief (and listed hereinabove), distinguishes between active and passive trusts by what is said in the deed. If no active duties are imposed, the trust is passive, and its existence may be established by parol evidence of the intention of the parties.
 
 
 38
 "Chase National, as has been noted, was the holder of personal as well as real property. Deposits in and disbursements from bank accounts were made in its name. It held notes and gave notes; it received rents and profits from land not in its name. If one wonders how it could be said to have no income and hold no assets in personalty (since the statute of uses operates only upon conveyances of land), the answer lies in Florida equity. There is no suggestion in the Florida cases of the execution of a use in personalty. But, the rents and profits from land (whether or not title to the land resided in the passive trustee) belong to the beneficial owner, and from this base the Florida courts have not hesitated to declare the beneficial owner entitled to any and all emoluments rightfully his, irrespective of any corporate body which might stand between the emoluments and the beneficial owner.
 
 
 39
 "It is concluded that under Florida law Chase National owned no property at any time. The corporation received no income which could be characterized under Florida law as corporate earnings or profits, and it held no rights or substance which could be characterized under Florida law as corporate assets."
 
 
 40
 The court deems it unnecessary to determine whether or not this view of Florida law is correct.
 
 IV
 
 41
 Even if plaintiff's logic (in relation to the statute of uses and Florida equity) is impeccable, the Supreme Court's rejection of the practical application for which plaintiff contends is adamant, as indicated by the following excerpts from Tomlinson v. Miles, supra:[9]
 
 
 42
 The taxpayers contend that the effect of [their] arrangement was to create the corporation as a naked trustee of title for the taxpayers who were the beneficial owners and, under the Florida law of trusts, also the legal owners of the property. The Government, on the contrary, contends that, having elected to have the transaction handled in corporate form, the corporation may not be excused from reporting the transactions resulting in a profit as its own profit, and paying taxes on this income entirely separately from the tax obligations of the individual taxpayers who were really stockholders of the corporation. The answer to this question is to be found by placing the facts of this case against the formula announced by the United States Supreme Court in Moline Properties v. Commissioner of Internal Revenue, * * *.
 
 
 43
 * * * [Taxpayers] contend that this corporation was the holder of a mere naked record title with neither legal nor equitable ownership of the property and that therefore such business as was carried on by the corporation does not fall within the formula * * *. We find no such limitation in the formula adopted by the Supreme Court in the Moline Properties case. That no such limitation is intended is made clear by the Court's subsequent opinion in National Carbide Corporation v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779. The Court there expressly called attention to its holding in the Moline Properties case, notwithstanding the findings of the Tax Court that full beneficial ownership of the property there involved was in the sole stockholder. The Court said:
 
 
 44
 "Undoubtedly the great majority of corporations owned by sole stockholders are `dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually. * * * We reversed the Board of Tax Appeals in Moline Properties in the face of its finding that `Full beneficial ownership was in Thompson [the sole stockholder], who continued to manage and regard the property as his own individually.'" [Emphasis added.]
 
 
 45
 * * * It goes without saying that where the Supreme Court has clearly established legal principles in dealing with the subject matter in litigation, we look to these principles for guidance. They are controlling on us. Particularly in light of the gloss which National Carbide Corporation v. Commissioner [of Internal Revenue], supra, has placed on the Moline Properties, Inc. case, we are unable to agree with the taxpayers here that their activities do not fall within the language of the formulation set down by the Supreme Court in the Moline Properties case.
 
 
 46
 In Moline and National Carbide, the Supreme Court has established and reaffirmed a formula which goes the whole distance in attributing to a corporation, as its own for tax purposes, income, earnings, profits, and assets that are, according to state law, beneficially (legally and equitably) owned by others.
 
 V
 
 47
 After rejecting the agency contentions of the taxpayer in National Carbide Corp. v. Commissioner of Internal Revenue, supra, the Supreme Court expressed the following qualification:[10]
 
 
 48
 What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. * * *
 
 
 49
 While the court's discussion centers on requirements for proof of a valid agency relationship, similar requirements would, if met, ostensibly establish a valid trust relationship.
 
 
 50
 When the Commissioner of Internal Revenue assessed taxes against Mr. Carver to the extent of his beneficial interests in Chase National transactions but excluded transactions wherein the beneficial interests belonged to Mr. Carver's clients, he drew the line improperly as to one transaction, because of the presence of a manifest relationship of either agency or trust or both.
 
 
 51
 In 1935, Mr. Carver joined with L. N. Pipkin, at Mr. Pipkin's request, in the purchase of some 800 acres of raw land in Hillsborough County, then up for foreclosure. Mr. Pipkin was president of the Bank of Mulberry. At his request, title to the land was taken in the name of Chase National, and arrangements were made whereby Chase National obtained a loan from and opened an account in the Bank of Mulberry. Mr. Pipkin, as the moving force in the transaction, saw to the payment of the loan with funds contributed by himself and Mr. Carver. Twenty years later, in 1955, Mr. Pipkin negotiated a sale of the land for a substantial profit.[11] The sale proceeds were paid to Messrs. Pipkin and Carver, and did not go through Chase National, although the deed of conveyance came, of course, from Chase National, since it held the legal title.
 
 
 52
 There is in evidence a copy of a document, dated August 30, 1935, signed "Chase National Company," by A. R. Carver, vice president, certifying that Chase National "is holding the title" of the Hillsborough County land "for the use and benefit of" the Pipkins, one-half, and the Carvers, one-half, "said property to be dealt with or conveyed upon the joint direction of said parties."
 
 
 53
 Considering the evidence of record concerning the history of the Pipkin transaction, including the document referred to above, the conclusion is inescapable that Chase National was either the agent of or the trustee for Mr. Pipkin, who was admittedly not an owner or stockholder of Chase National. If that relationship was valid for Mr. Pipkin, it must have been equally valid, under all of the circumstances, for Mr. Carver.
 
 
 54
 The plaintiff is therefore entitled to recover to the extent of taxes assessed to him by reason of Chase National's connection with this transaction.[12]
 
 VI
 
 55
 Plaintiff argues vigorously that the differentiation by the Commissioner of Internal Revenue between the beneficial ownership of the Carvers and that of Mr. Carver's clients is capricious (citing the Pipkin transaction as an illustration), and that it should vitiate the whole action by the Commissioner, leaving the Moline doctrine no application to the present cases.[13]
 
 
 56
 The Moline doctrine, attributing to a corporation by federal judicial fiat, the ownership of property recognized by the state as residing in others, reflects a broad sweep of policy. The justification for such a broad sweep must lie in the need for automatic protection of the federal revenue from erosion behind the corporate veil through the evasion or avoidance of taxes. The aim is not accomplished by piercing the corporate veil; it is attained by enveloping the corporation as a whole under one umbrella.
 
 
 57
 The evidence offers no explanation, other than as stated at the outset of this opinion, of the action by the Commissioner of Internal Revenue in making the differentiation as he did. In any event, the Commissioner's differentiation cannot be deemed to vitiate the whole of his action.
 
 
 58
 Plaintiff is not entitled to recover except as hereinabove indicated.
 
 
 
 Notes:
 
 
 *
 This opinion incorporates the opinion of former Trial Commissioner W. Ney Evans, with minor changes
 
 
 [1]
 Although A. R. Carver sues in various capacities, he is the claimant in both cases and is therefore referred to as the plaintiff, in the singular
 
 
 [2]
 Defendant's citations include: National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Love v. United States, 95 F.Supp. 919, 119 Ct.Cl. 384 (1951); Given v. Commissioner of Internal Revenue, 238 F.2d 579 (8th Cir. 1956); Skarda v. Commissioner of Internal Revenue, 250 F.2d 429 (10th Cir. 1957); Commissioner of Internal Revenue v. State-Adams Corp., 283 F.2d 395 (2d Cir. 1960), cert. denied, 365 U.S. 844, 81 S.Ct. 802, 5 L.Ed.2d 809 (1961); Hagist Ranch, Inc. v. Commissioner of Internal Revenue, 295 F.2d 351 (7th Cir. 1961); and Tomlinson v. Miles, 316 F.2d 710 (5th Cir.) cert. denied, 375 U.S. 828, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963)
 
 
 [3]
 The corporation (as the petitioner-taxpayer inMoline) urged that it was a mere agent for its sole stockholder. In rejecting this premise, the court said (319 U.S. at 440-441, 63 S.Ct. at 1135): "There was no actual contract of agency, nor the usual incidents of an agency relationship. Surely the mere fact of the existence of a corporation with one or several stockholders, regardless of the corporation's business activities, does not make the corporation the agent of its stockholders. Therefore the question of agency or not depends upon the same legal issues as does the question of identity [after ego] previously discussed."
 
 
 [4]
 319 U.S. at 438-439, 63 S.Ct. 1132
 
 
 [5]
 96 F.Supp., at 922, 119 Ct.Cl., at 405
 
 
 [6]
 Cases cited include: Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940), and cases therein cited; Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937); Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932); and specifically as to Florida, Tracy v. Commissioner, 25 BTA 1055 (1932)See also Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).
 
 
 [7]
 Aquilino, supra, 363 U.S. at 513, n. 3, 80 S.Ct. at 1280.
 
 
 [8]
 The text of the Florida statute of uses is set forth in the opinion in Elvins v. Seestedt, 141 Fla. 266, 193 So. 54, at 58, 126 A.L.R. 1001 (1940)
 
 
 [9]
 316 F.2d at 713-715
 
 
 [10]
 336 U.S. at 437, 69 S.Ct. at 734
 
 
 [11]
 Mr. Carver reported the gain on his 1955 income tax, indicating a gain of close to $80,000. His costs had been $8,000, and his one-half interest brought $88,000
 
 
 [12]
 Defendant conceded at the trial that Chase National should not have been taxed on interest income received after June 15, 1957, the date of the blanket conveyance by Chase National to Mr. Carver. Plaintiff is therefore entitled also to recover to the extent of the taxes so assessed
 
 
 [13]
 Excerpts from plaintiff's brief: "A theory so illogical in its application cannot be a sound basis for imposing tax. * * * The doctrine of `separate corporate entity' simply cannot be applied to a situation where the government attempts to sort outsome of the transactions in the name of that `separate corporate entity' and says that they are taxable to that corporate entity; and that others, similarly of record, are not. * * *"