445 F.2d 455
 71-2 USTC P 9521
 Philip TAYLOR et al., Petitioners, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.
Philip TAYLOR, Petitioner, Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.
Jack J. MOSS et al., Petitioners, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.
MIDDLESEX INDUSTRIAL PARK, INC.Petitioner, Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.
 Nos. 71-1093 to 71-1096.
 United States Court of Appeals, First Circuit.
 June 29, 1971.
 
 Norman E. Bayles, Washington, D.C., with whom Trammell, Rand, Nathan & Bayles, Washington, D.C., was on the brief, for appellants.
 Carolyn R. Just, Atty., Tax Division, Dept. of Justice, with whom Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, and Bennet N. Hollander, Attys., Tax Division, Dept. of Justice, were on the brief, for appellee.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 These cases are consolidated actions brought by taxpayers contesting certain deficiencies in income tax asserted against them by the Commissioner of Internal Revenue. The taxpayers and appellants are Jack J. Moss, Philip Taylor, and Middlesex Industrial Park, Inc. The alleged deficiencies arise out of land transactions in 1957, 1958, and 1959 involving Middlesex, Moss, and Taylor and out of the sale of various tracts of land by Moss in 1956, 1957, and 1958. The cases resulted in two trials before the Tax Court. Taxpayers appeal the Tax Court's rulings.
 
 I.
 
 2
 As partners, moss and Taylor, owned 70 acres of land on which they operated a gravel pit. Moss owned an adjacent tract of 13.5 acres. They were approached by a potential buyer who insisted, as a condition of sale, that the land be rezoned. Because Moss was active in town politics, he was reluctant to seek rezoning openlyAnd so he and Taylor caused Middlesex to be formed in 1957. Engaging in real estate transactions was among its corporate purposes.
 
 
 3
 Title to the land was transferred to the corporation, but it issued no stock. Subsequently, Middlesex made an agreement of sale with the buyer for part of the 83.5 acres. Middlesex also opened a bank account with $2000 of Moss's money, and some of the proceeds from the gravel pit were deposited to this account. Before the sale was made. Taylor and Moss had to raise money for another purchase of land. They did so by having Middlesex borrow $25,000 on a note which they co-signed. When the sale of Middlesex's land was closed, the proceeds were used to liquidate the debt. After Middlesex's land was sold, the money was deposited in its account and distributed to Moss and Taylor. To secure this payment, the buyer took a mortgage from Middlesex on the land. A final payment, representing the portion of the land held by Middlesex which had been solely owned by Moss, was made directly to Moss. Middlesex still had title to a small amount of land after this sale was completed, and Moss and Taylor purchased some abutting land which they also transferred to Middlesex. Subsequently this land was deeded back to the partnership. All these transactions occurred over a period of two years.
 
 
 4
 The income from the slae of land was reported solely as long term capital gains by Moss and Taylor. The Commissioner proposed deficiencies against Middlesex on the grounds that income in 1957, 1958, and 1959 from the gravel pit and the sale was corporate income and against Taylor and Moss on the grounds that the income they had received was a corporate distribution. The Tax Court upheld the Commissioner's determination.
 
 
 5
 Appellants' position is that Middlesex was a straw for Moss and Taylor and was a corporation in name only and not for tax purposes. The Supreme Court has not proved receptive to pleas similar to that of appellants, holding that:
 
 
 6
 'Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.' Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 436, 438-439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943).
 
 
 7
 Although federal courts have, on occasion, upheld the Commissioner's disregard of a corporate entity,[1] this has generally been done to prevent unfair tax avoidance. Only in situations where a corporation performs no function but the holding of title to real estate, have courts ignored the corporate entity.[2]
 
 
 8
 We agree with the Tax Court that Middlesex did more than hold title to land owned by Moss and Taylor. It was active for two years, during which time it collected revenues from the gravel opened a checking account; borrowed money; executed deeds, buy-sell agreements, and a mortgage. It is true that Moss and Taylor dominated the corporation and often ignored the corporate structure, but that is often the case with closely held corporations. The Supreme Court has said that 'when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise.' National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 431-432, 69 S.Ct. 726, 731, 93 L.Ed, 779 (1949).
 
 
 9
 We believe that Middlesex's business activities were too extensive to support taxpayers' theory that it was not doing business. If Middlesex were to serve only as a straw, it should have only performed those transactions essential to the holding and transferring of title. Middlesex did more and cannot escape the tax disadvantages which come from utilizing the advantages of the corporate form. Accord, Carver v. United States, 412 F.2d 233, 188 Ct.Cl. 202 (1969); Love v. United States, 96 F.Supp. 919, 119 Ct.Cl. 384 (1951).
 
 II.
 
 10
 In addition to its holding that Middlesex was a corporation subject to the Federal Income Tax, the Tax Court also determined, in the same proceedings, Moss's tax liability for five mortgages received as partial payment for the sale of land in the years 1956, 1957, and 1958. Moss had purchased land in Burlington, Massachusetts, which he had subdivided into lots and resold in bulk, to real estate developers. As partial payment, he accepted mortgages. At the first trial, the Tax Court determined that these mortgages were taxable at their fair market value and held that the fair market value was, as the Commissioner had determined, the face amount of the mortgages.
 
 
 11
 After the first trial, Moss sought a new trial by filing a motion for reconsideration with regard to three issues: (1) whether Middlesex was a separate taxable entity, (2) whether the value of the five mortgages equaled their face amount, and (3) whether property held by Moss was held primarily for investment, and hence taxable at capital gains rates, rather than primarily for sale to customers in the real estate business as the Tax Court had determined. The Tax Court granted a new trial on the value of the mortgages but refused to reconsider the other two issues. At the second trial, Moss and three expert witnesses testified that the mortgages had no fair market value when they were received by Moss as payment, and the government's expert testified that they did have value, but not equal to their face amount. The Tax Court rejected Moss's position but fixed the mortgages' value at less than the estimate of the government's expert.
 
 
 12
 On appeal Moss asserts (A) that the denial of a new trial on the issue of Middlesex's status as a taxable corporation and on the investment status of other real estate owned by Moss was an abuse of discretion; (B) that the government's expert was not qualified to testify; (C) that there was no substantial evidence that the mortgages had a fair market value; and (D) that the Tax Court erred at the second trial in holding that Moss had the burden of disproving the Commissioner's determination of the fair market value of the five mortgages.
 
 A. The Motion for Reconsideration
 
 13
 In the motion for reconsideration, taxpayers asserted that they had been unable to call two witnesses because the Tax Court had denied their request, made at 4:45 p.m. on the first day of trial, to put on the witnesses, who were not in court, the next morning. An affidavit by one of the witnesses states that he would have testified that Moss and Taylor had to co-sign the $25,000 loan to Middlesex. This is the only additional evidence relating to Middlesex that taxpayers claim they would have put on. It would not have been sufficient to alter the Tax Court's finding that Middlesex did sufficient business to be taxed as a corporation. Other reasons put forth in support of reconsidering Middlesex's status were not new and were properly rejected by the Tax Court.
 
 
 14
 In support of his motion for reconsideration on the question whether real estate sold by Moss was held promarily for investment purposes or was held primarily for slae to customers, Moss argued that the Tax Court applied an erroneous rule of law. Soon after the first trial, the Supreme Court decided Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), interpreting the provision of the Internal Revenue Code, 26 U.S.C. 1221(1), which denies capital gains treatment to property held 'primarily' for sale to customers in the ordinary course of business. The Court held that a 'substantial' purpose could not be equated with a 'primary' one and that 'primary' means 'of first importance' or 'principally'. Moss argues that the Tax Court erroneously equated 'primary' and 'substantial'.
 
 
 15
 There is no suggestion in the Tax Court's opinion that it did not apply the word 'primary' as the Supreme Court interpreted it in Malat. Moss cites only the Tax Court's mentioning that Moss's income from real estate sales far exceeded his income from his legal practice. We cannot interpret this reference as inconsistent with Malat. The Tax Court listed many factors, the size of Moss's real estate business among them, in reaching its conclusion. We see no suggestion that the Tax Court applied the wrong standard, and we conclude that it properly denied the motion for reconsideration of this issue.
 
 B. The Government's Expert Witness
 
 16
 Over Moss's objection, the Tax Court, at the second trial, permitted Donald O'Farrell, an evaluation engineer employed by the Internal Revenue Service, to testify as an expert on the value of the five mortgages. O'Farrell held degrees in Civil Engineering and Economics, had been employed as a cost engineer before coming to work for I.R.S., and had served as an evaluation engineer for seven years before the trial. He was not a professional mortgage evaluator, but he regularly evaluated intangibles for I.R.S. This court has held:
 
 
 17
 'Whether a witness is qualified to express an expert opinion is a matter left to the sound discretion of the trial judge. In the absence of clear error, as a matter of law, the trial judge's decision will not be reversed.' A. Belanger & Sons, Inc. v. United States, etc., 275 F.2d 372, 376 (1st Cir. 1960).
 
 
 18
 See Redding v. Picard Motor Sales, Inc., 403 F.2d 788, 792 (1st Cir. 1968). The Tax Court's decision allowing O'Farrell to testify as an expert was within its sound discretion.
 
 C. The Value of the Mortgage
 
 19
 The Tax Court did not accept O'Farrell's figures for the fair market value of the mortgages, nor did it accept the testimony of Moss's experts that the mortgages had no value when given. Instead, in a careful and comprehensive opinion, it weighed various factors relating to value and reached its own figures. Moss attacks those figures and argues that the determination that the mortgages had value was not supported by substantial evidence.
 
 
 20
 The fair market value of the mortgages is a question of fact, and this court will not overturn the Tax Court's findings unless they are clearly erroneous. Riss v. Commissioner of Internal Revenue, 368 F.2d 965, 970-971 (10th Cir. 1966); Kuehner v. Commissioner of Internal Revenue, 214 F.2d 437, 439 (1st Cir. 1954). In support of Moss's contention that the mortgages had no value, his experts relied on provisions in the underlying contract imposing certain obligations on Moss and requiring Moss to refund any compensation if he did not fulfill his obligations. The witnesses testified that Moss's ability to fulfill the underlying contract was so doubtful that no buyer would be willing to purchase the mortgages from him. Among the problems confronting Moss were title defects, requirements that the town Planning Board issue building permits and approve the developments, obligations to install roads and make other improvements. O'Farrell testified that these problems were minor, and that the mortgages had substantial value. In addition to relying, in part, on O'Farrell's testimony, the Tax Court carefully analyzed all the reasons put forth by Moss's experts in support of their claim of no value. It found in several instances that Moss's witnesses were mistaken. For example, one title defect pointed to by a Moss witness had been cleared up before the mortgage was given. Another witness failed to recognize that many of the improvements called for in the contract of sale had been made by the time the mortgage was given and did not affect its value. In some instances, the Tax Court accepted the testimony of Moss's experts and discounted the figures given by O'Farrell. In short, the Tax Court's evaluation was the result of an exhaustive analysis of the testimony before it.
 
 
 21
 On appeal, Moss does not attempt to refute the Tax Court's analysis. Instead, he attempts to relitigate the evaluation issue by reasserting his witness's estimates and attacking O'Farrell's figures. No attempt is made, that we can see, to demonstrate how the Tax Court's findings are clearly erroneous. Intead, Moss makes the same arguments he made before that his witnesses are right and O'Farrell is wrong. The Tax Court has already made an extensive evaluation of these arguments. We see no reason why we should repeat that evaluation. We hold that the findings below were not clearly erroneous.
 
 D. The Burden of Proof
 
 22
 We confess to being puzzled as to the relevance of Moss's final argument. While agreeing that taxpayers normally bear the burden of proving wrong a deficiency asserted by the Commissioner, he claims that this burden is met by proving the Commissioner's determination is erroneous. The Commissioner must then, under Moss's theory, establish the correct deficiency. He argues that the Commissioner's deficiency was proven erroneous when O'Farrell the Commissioner's own expert, testified that the fair market value of the mortgages was less than the face amount, which the Commissioner had originally asserted as their value.
 
 
 23
 Assuming that Moss's argument is true, it is not clear what consequences follow that would alter the outcome of this litigation. Moss never makes clear whether he is speaking of the burden of going forward or the risk of nonpersuasion when he uses the term 'burden of proof', but in either case, there is no ground for reversal. If he is speaking of burden of going forward, it is clear that the government met that burden. For at the same time O'Farrell contradicted the figures originally asserted by the Commissioner, he asserted his own substitute evaluation. If he speaks of risk of non-persuasion, we fail to see his point. The risk of non-persuasion becomes a factor only when the decisionmaker cannot decide which party should prevail. The Tax Court did not rule that it was in equipoise on the value of Moss's mortgages; it made a determination as to what the proper figures were.
 
 
 24
 Whatever point Moss was attempting to make, his own cases support the result reached by the Tax Court. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Federal National Bank of Shawnee, Oklahoma v. Commissioner of Internal Revenue, 180 F.2d 494 (10th Cir. 1950); Greenfeld v. Commissioner of Internal Revenue, 165 F.2d 318 (4th Cir. 1947), all cited by Moss, say that if a taxpayer proves that a deficiency asserted by the Commissioner is wrong but fails to prove there was no deficiency or the correct figure, the Tax Court cannot accept the Commissioner's admittedly erroneous figure. Instead it must hold a hearing to determine what the correct figure is. That, of course, is what happened in this case; the Tax Court rejected the Commissioner's and the taxpayers' figures and made its own determination. We see no possible error in this procedure.
 
 
 25
 Affirmed.
 
 
 
 [1]
 E.g., Kimbrell v. Commissioner of Internal Revenue, 371 F.2d 897 (5th Cir. 1967); Jackson v. Commissioner of Internal Revenue, 233 F.2d 289 (2d Cir. 1956); O'Neill v. Commissioner of Internal Revenue, 170 F.2d 596 (2d Cir. 1948), cert. denied, 336 U.S. 937, 69 S.Ct. 747, 93 L.Ed. 1096 (1949)
 
 
 [2]
 E.g., United States v. Brager Building & Land Corp., 124 F.2d 349 (4th Cir. 1941)