INA L. BLOCK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Block v. Commissioner
Docket No. 6073-76.
United States Tax Court
T.C. Memo 1980-554; 1980 Tax Ct. Memo LEXIS 34; 41 T.C.M. (CCH) 546; T.C.M. (RIA) 80554; December 15, 1980
Jerome B. Lieber and Thomas M. Levine, for the petitioner. Russell F. Kurdys, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax in the following amounts for the following taxable years: Taxable Year
Deficiency
1970
$ 2,047
1971
3,858
1972
9,056
1973
923
After concessions by petitioner, the only issue we must decide is whether she may deduct her husband's distributive share of certain losses of a partnership of which he was a partner during 1971, 1972 and 1973. *36 Taxable year 1970 is here in issue solely because of a net operating loss resulting from the disputed deductions which loss was carried back to that year. The correct amount of petitioner's allowable 1972 and 1973 charitable contributions and medical expense deductions will be determined by our disposition of the partnership loss issue. FINDINGS OF FACT Some of the facts were stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Ina L. Block (herein petitioner) resided in Pittsburgh, Pennsylvania, when she filed her petition herein. She and her husband, Peter H. Block (herein Block), filed joint Federal income tax returns for their taxable years 1970 through 1973. Though the Commissioner sent a statutory notice of deficiency only to petitioner, both she and Block petitioned this Court for a redetermination of their tax. Block was dismissed from this action for lack of jurisdiction as to him; however, he will be the primary actor in this factual scenario. Petitioner is before this Court because she filed a joint return with Block. Block has been involved with professional hockey in Pittsburgh for many years. *37 In 1966, when the City of Pittsburgh received its first National Hockey League (NHL) franchise, Block owned stock in the Hockey Club of Pittsburgh, Inc. In 1968, he sold all of his shares of stock in such corporation to Hockey Club of Pittsburgh, a limited partnership (herein Club). On May 19, 1971, Pittsburgh Hockey Corporation (Corporation) was organized. Block was the vice president of Corporation and owned 27 percent of the common stock therein through 1973. In 1974 the became president of Corporation. On May 24, 1971, a Certificate of Limited Partnership for Pittsburgh Hockey Limited Partnership (herein PHLP) was filed in the Recorder of Deeds Office of Allegheny County, Pennsylvania. The attendant limited partnership agreement was executed on May 20, 1971. Corporation and an individual by the name of Thayer Potter (herein Potter) were designated in those two documents as the only general partners of PHLP. Block was designated a Class C limited partner with a 7.29 percent interest in the partnership. All management powers were vested in the general partners. Allocation of items of income, gain, loss, deduction and credit was controlled by section 7.02 of the PHLP *38 limited partnership agreement, which provided as follows: Section 7.02. Partners' Shares of Tax Profits and Losses. The items of income, gain, loss, deduction and credit of the Partnership for state and federal income tax purposes for each taxable year of the Partnership, shall be allocated for such taxable year among the Partners according to their respective percentage interests in the Partnership during such year; provided, however, that to the extent that any Partner shall not have any remaining adjusted basis with respect to his interest in the Partnership for federal income tax purposes, any portion of any item of loss of the Partnership which such Partner shall thereby be prevented from deducting in accordance with the Internal Revenue Code shall be reallocated to the other Partners in proportion to their respective percentage interests in the Partnership. On May 25, 1971, a Certificate of Limited Partnership for Pittsburgh Penguin Partners (Limited Partnership) (herein PPP) was filed in the Recorder of Deeds Office of Allegheny County, Pennsylvania. The attendant limited partnership agreement was executed on May 20, 1971. PHLP and Potter were designated in these *39 two documents as the only general partners of PPP. Corporation was the sole limited partner. PHLP originally had a 99.944 percent interest in the partnership. All management powers were vested in the general partners. Allocation of items of income, gain, loss, deduction and credit was controlled by Section 6.02 of the PPP limited partnership agreement, which provided as follows: Section 6.02 Partners' Shares of Tax Profits and Losses. The items of income, gain, loss, deduction and credit of the Partnership for federal and state income tax purposes for each taxable year of the Partnership shall be allocated among the Partners in accordance with their respective percentage interests in the Partnership during such taxable year. In both PHLP and PPP, the liability of each limited partner was limited to the capital contributions paid or to be paid by such limited partner. On June 2, 1972, Club entered into an agreement with Block, Potter, and Elmire Keener, Jr., which agreement provided that the trio would purchase the assets of Club, which constituted all the assets of the Pittsburgh Penguins. Thereafter, the trio assigned their rights under this agreement to PHLP which, in *40 turn, assigned the rights to PPP. PPP subsequently purchased the assets of Club. Block was admitted as a limited partner in PHLP because he had experties in the field of hockey team operations and because he would be able to juggle the disparate interests of the prior creditors of the hockey franchise. The NHL required that either PHLP or PPP obligate itself to satisfy creditors of the prior ownership group as a prerequisite to either PPP or PHLP taking control of the franchise. During his taxable years 1971, 1972 and 1973, Block received compensation from PPP in the respective amounts of $ 8,953, $ 28,708, and $ 13,537. On the U.S. Partnership Return of Income (Form 1065) for PPP for the short period January 1, 1973 through May 31, 1973, Block first appears as a partner. Up until this time he had not been listed as a partner of PPP on the information returns filed by PPP. Block's profit-sharing percentage in PPP, as shown on the PPP return for the above-mentioned short period, was.0015 percent and his allocable share of the loss shown on the face of the return was $ 5.22. That return indicates a capital investment in PPP by Block of $100 during the fiscal year ended May 31, 1973. *41 During all relevant times, PPP owned all of the assets of the professional hockey club, the Pittsburgh Penguins, which assets consisted mainly of player contracts, a stadium lease, the NHL franchise, and miscellaneous equipment. PPP was in no other business except operating the hockey club. Potter, a general partner of both PHLP and PPP, controlled PPP. He spent most of his working time as the controlling figure in both PHLP and PPP during 1971 through 1975. He had the ultimate absolute authority in both PHLP and PPP, and, in effect, over the Pittsburgh Penguins franchise during the years in issue. He spent his entire working day on Penguin matters. He made all of the final decisions in the operations of the Penguin franchise, signed the player contracts (as general partner of PPP), signed the Civic Arena lease (as general partner of PPP), and was ultimately responsible under the partnership agreements of PHLP and PPP for the management of the Penguin franchise. On the Forms 1965 for PHLP which were filed for its taxable years 1971, 1972, and 1973, it was indicated that Block devoted no time to the business of PHLP. On Corporation's 1971, 1972, and 1973 corporate income *42 tax returns, it was indicated that Block devoted part of his time to the business of Corporation. Block was actively involved in the activities of the hockey franchise. During the years in issue, Block was appointed by the Penguins as Governor to the NHL on behalf of the hockey team. It was required that such appointment be made in writing by an authorized authority of the franchise. In this case, Potter, as general partner of PPP, designated Block as Governor in a writing addressed to Clarence Campbell, who was the President of the Board of Governors of the NHL. The duties of a Governor of a hockey franchise to the NHL were defined by the by-laws and constitution of the NHL. The Governors vote at the meetings, approve expenditures of the league, and vote on the budget. The Governor derived his authority solely and directly from the owner of the franchise, here PPP. Block took many actions as the Penguins' representative on the Board of Governors that obligated the owner of the franchise to expend large sums of money. Many of the actions taken by Block in behalf of the Penguins franchise were later ratified in some manner by the general partner of PPP, Potter. In addition, *43 Block performed other services for the franchise. He scheduled games, oversaw employees, negotiated the lease with the Civic Arena where the Penguins played their home games, and negotiated player trades with other teams. Employees of the Penguins considered Block to be one of their two "bosses," the other being Potter. Block participated in the hiring of Jack B. Button as assistant general manager and director of player personnel. On February 1, 1973, PPP, PHLP, Potter and Corporation entered into a loan agreement with Western Pennsylvania National Bank (herein Bank) under the terms of which Bank agreed to lend $ 2,150,000 to those borrowers for the operation of the hockey franchise. In a separate arrangement, Bank agreed to extend a $ 900,000 line of credit to the borrowers for similar purposes. A portion of the process from the loan were used to extinguish a loan of indeterminate amount consummated between the same parties on June 3, 1971. Simultaneously, petitioner and Block signed an "Agreement of Guaranty and Suretyship" whereby they guaranteed payment of the $ 2,150,000 loan and the $ 900,000 line of credit. They had also guaranteed the first loan. The information *44 returns (Forms 1065) of PPP and PHLP reported the following total liabilities for the taxable years of the partnerships ending with or within the following calendar years: Year
PPP
PHLP
1971
$ 3,100,949.15
$ 0
1972
3,611,468.00
1,000.00
1973
3,472,739.00
11,143.00
Regardless of the actual amount of the liabilities of PPP and PHLP during the years before us, all of the liabilities were recourse liabilities. For the years 1971, 1972, and 1973, petitioner claimed on her joint Federal income tax returns ordinary losses of $ 32,818, $ 62,608, and $ 20,208, respectively, as partnership losses based on Block's partnership interest in PHLP. Also for the year 1972, petitioner claimed a capital loss of $ 796 and a section 1231 loss of $ 2,856 based on Block's partnership interest in PHLP. For the same taxable year, petitioner reported a long-term capital gain from the sale of a portion of Block's partnership interest in PHLP. With regard to this latter sale, petitioner used an $ 851 adjusted basis to calculate the gain on the sale of the partnership interest. The Commissioner disallowed all of these losses, and increased the gain on the sale of Block's *45 partnership interest by $ 851, on the ground that Block had insufficient basis in his partnership interest to absorb the losses and to allocate to the partnership interest sold. Other deductions were disallowed but are no longer in issue. The Commissioner determined deficiencies in petitioner's Federal income tax for 1971, 1972, and 1973 based upon this analysis of Block's basis in his partnership interest during those years. Inasmuch as petitioner received a tentative refund of $ 2,047 for the taxable year 1970 based on a net operating loss carryback to that year from taxable year 1972, which net operating loss carryback was attributable to the disputed losses deducted on her 1972 return, the Commissioner determined a deficiency in the amount of $ 2,047 for her taxable year 1970. The correctness of all of the Commissioner's determinations which remain in dispute depends upon our determination of Block's basis in his partnership interest in PHLP (and possibly PPP) during the relevant years. ULTIMATE FINDING OF FACT Block did not take part in the control of the business of either PPP or PHLP during 1971, 1972, or 1973. OPINION Petitioner's husband, Peter H. Block, with *46 whom she filed joint Federal income tax returns for the taxable years in issue, owned a limited partnership interest in PHLP, which limited partnership was, along with an individual named Potter, a general partner in PPP, the limited partnership which owned and operated the Pittsburgh Penguins professional hockey franchise. Block was actively involved in the activities of the hockey franchise from 1971 through 1973, serving as the Penguins' representative to the Board of Governors of the NHL and also performing numerous management activities for the franchise. PPP incurred some ordinary and capital losses during the years in question which losses are, assuming Block had sufficient adjusted basis in one or both of the partnerships, allocable to Block. Block also sold a portion of his PHLP limited partnership interest in 1972, and the amount of his gain realized on such sale is dependent upon whether he had, as petitioner contends, any remaining basis in that partnership interest. The resolution of the deductibility of these ordinary and capital losses depends upon whether Block may include in his partnership interest basis an allocable portion of the recourse liabilities of PPP and/or *47 PHLP. Respondent contends that he may not and determined deficiencies in petitioner's Federal income tax based upon that contention. In determining his income tax, a partner is to take into account his distributive share of the various items of income, deduction, gain, loss, and credit of the partnership of which he is a partner. Sec. 702(a), I.R.C. 1954. [1] A partner's distributive share of such items is to be determined by the partnership agreement, except as otherwise provided in Chapter One of the Internal Revenue Code of 1954. Sec 704(a). As in effect for the taxable years before us, section 704(d) provided: (d) LIMITATION ON ALLOWANCE OF LOSSES.--A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss *48 occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. Thus, the amount of a partner's basis at the end of a partnership year is critical to the determination of how much of his distributive share of the partnership's losses for that year will be allowed as deductible losses on his return. The basis of a partner's interest in a partnership equals the adjusted basis of property contributed by the partner to the partnership plus the amount of money contributed by the partner to the partnership. Sec. 722. Any increase in a partner's share of the liabilities of the partnership is considered as a contribution of money by such partner to the partnership. Sec. 752(a). Since, under sections 705 and 722, contributions of money by a partner to a partnership result in a corresponding increase in that partner's basis in the partnership, the treatment prescribed by section 752(a) results in an increase in a partner's basis to the extent of the increase in his share of the partnership's *49 liabilities. [2]
The critical question that arises is this: What constitutes "A partner's share of the liabilities of a partnership?" Though Congress has not addressed this issue directly, the Secretary of the Treasury has definitively answered this question in section 1.752-1(e), Income Tax Regs., which provides: (e) Partner's share of partnership liabilities. A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreements. In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the *50 limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits. * * * Petitioner does not challenge the validity of this regulation. She merely argues that Block was not, for purposes of applying these regulations, a limited partner of PHLP, but rather was a general partner and, thus, may utilize the recourse liabilities of PPP and PHLP to increase his basis in PHLP. She makes this claim, which is at variance with Block's designation under the PHLP limited partnership agreement, based upon these assertions and arguments: (1) Under Pennsylvania law, a limited partner may become liable as a general partner if, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business; (2) Petitioner's husband, Block, took part in *51 the control of PHLP and/or PPP and, thus, would have been liable as a general partner in Pennsylvania under its version of the Uniform Limited Partnership Act (ULPA); (3) Since Block would have been treated as a general partner of either PHLP or PPP under state law, he should be so treated for purposes of applying section 1.752-1(e), Income Tax Regs.[3]
Completing her attempt to prove Block's entitlement to use the liabilities of PPP to provide him with adequate basis with which to absorb his allocable share of the losses of PPP and PHLP, petitioner goes on to assert that PPP had recourse liabilities in the amounts shown on its Forms 1965 for the relevant taxable years. Item three listed above presents an intriguing issue, [4] but we need not decide it because petitioner *52 has failed to prove that Block took part in the control of either partnership in such a manner that he would have, under Pennsylvania law, become liable as a general partner. Unless a partnership's liabilities are otherwise restricted, a general partner of that partnership is liable for all of that partnership's liabilities. 59 Pa. Cons. Stat. Ann. sec. 37 (Purdon 1964). However, a limited partner's potential exposure to such liabilities, as here relevant, is mandated by 59 Pa. Cons. Stat. Ann. sec. 191 (Purdon 1964), which provided: Sec. 191. Limited partner not liable to creditors. A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business. 1917, April 12, P.L. 55, sec. 7. The Pennsylvania law governing *53 general and limited partnerships was essentially identical to the Uniform Partnership Act and the Uniform Limited Partnership Act which were extent at that time. The leading case construing the "control test" in Pennsylvania is Gast v. Petsinger, 228 Pa. Super. 394, 323 A.2d 371 (1974). In that case the court held that the question of whether or not a limited partner had become a general partner and subject to the obligations of the limited partnership was a question of fact. The court stated that, under the facts of that case where two limited partners had been employed by the partnership as independent consultants, the test was not whether the putative general partners actually worked for the partnership or, through their positions, advised the partnership or the general partner, but rather whether their work and advice not only influenced the general partner or partnership but also actually controlled the decisions of the general partner. Citing favorably decisions of other states and of federal courts which have dealt with this issue, the court summarized these decisions *54 with these words: the following did not constitute taking part in the "control" of the business: acting as a foreman in the employ of the partnership, with the power to purchase parts as necessary without consulting the general partner, but without the power to extend credit without prior approval from the general partner or deal with the partnership account * * * acting as a member of the board of directors of the partnership (although the Court noted that he never did actually serve as such) * * * acting as sales manager in a new car sales department of the partnership without power to hire or fire, and, with power to order cars only with the general partner's approval * * * and, participating in the choice of key employees and giving a certain degree of "advice" * * *. [323 A.2d at 374; Citations omitted.] The court decided that the determinative question in this context is, "Does the limited partner have decision-making authority that may not be checked or nullified by the general partner?" Gast v. Petsinger, 323 A.2d 371, 375 (1974). With this statement of the applicable Pennsylvania law before us, it is clear that Block did not "take *55 part in the control of the business" of PPP or PHLP in any way which would, under the controlling state law, subject him to liability as a general partner. Block performed many services for the hockey franchise (technically for PPP) and was compensated therefor by PPP. He functioned as Governor of the Pittsburgh Penguins, i.e., as the franchise's representative to the Board of Governors of the NHL, but only at the behest of Potter and only upon his written appointment to the position. Undoubtedly Block bound the Penguins to many obligations vis-a-vis the NHL, but all such actions were within the scope of his employment. Block was merely an agent of the partnership, and his actions as Governor did not constitute taking part in the control of the business of PPP, the owner of the franchise. Though petitioner introduced testimony by James Cullen, an attorney for the NHL during the years in question, that he thought that Block was a general partner of both PPP and PHLP (which testimony was weakened by further testimony by Mr. Cullen that he had read the partnership agreements of both PPP and PHLP), such testimony is unpersuasive in light of the fact that Mr. Cullen also testified that *56 many of Block's actions were later ratified by Potter and, further, is irrelevant to the question of whether Block had unchecked decision-making authority. Other testimony adduced by petitioner not only failed to prove such authority, but also strengthened our conviction that Block was merely an employee of PPP, albeit a highly trusted one. Potter himself testified that he clearly had the absolute authority to run the assets of either partnership. In light of the unequivocal disposition of such power in his hands by the controlling instruments, we could not agree more. A further problem with petitioner's attempt to retroactively gain general partner status for Block on account of his activities is the confusion regarding which partnership Block supposedly participated in controlling. Disregarding Block's possible deminimus limited partnership interest in PPP during the first five months of 1973, [5] Block owned no direct interest in PPP during the years before us. However, all of Block's activities to which petitioner points in order to prove that he participated in the control of PHLP so that he can be deemed a general partner of PHLP are activities with regard *57 to the hockey franchise which was an assert of PPP. Petitioner would have us collapse the two partnerships into one entity for the purpose of observing and ruling on the effect of the activities of Block. Our finding regarding the efficacy of Block's activities to transform him into a general partner makes such an exercise unnecessary. To summarize, we find as a fact that Block did not participate *58 in the control of the business of either PPP or PHLP during 1971, 1972, or 1973. Thus, we need not decide what effect a contrary finding on that state law issue would have on petitioner's Federal income tax liability. Petitioner's alternatively argues that she and Block guaranteed a loan to the partnerships made by Western Pennsylvania National Bank on June 3, 1971, and that such guaranty provides the needed basis under petitioner's construction of section 1.752-1(e), Income Tax Regs. Petitioner cannot prevail on the strength of this alternative argument for two reasons. First, for the taxable years 1971 and 1972, petitioner and Block were guarantors of a loan from the Bank to the partnerships, but there is no evidence of the amount of such loan. Thus, petitioner has failed to prove a fact that she must prove in order to prevail on this theory. More important, however, is the second reason why petitioner reaps no benefit from this argument, which reason is this: guaranteeing a partnership liability, outside of the auspices of the partnership agreement, does *59 not transform that debt into part of the "total contribution which he [the partner] is obligated to make under the limited partnership agreement." Sec. 1.752-1(e), Income Tax Regs. (emphasis added). [6] Even in 1973, when petitioner and Block were admittedly guarantors of $3,050,000 worth of partnership debt, such contingent liability arose outside the partnership agreements and, thus, while still contingent provided no basis for Block or petitioner. Inasmuch as all of the concessions before trial were made by petitioner, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. We will assume, without deciding, that an increase in the liabilities of PPP will provide sec. 752(a) basis increases not only for the appropriate partners thereof, but also, for the appropriate partners of PHLP, the general partner of PPP. See Rev. Rul. 77-309, 1977-2 C.B. 216↩.
3. Respondent contends that the rule of law in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967), precludes Block from challenging his status as a limited partner. Though the Danielson case seems readily distinguishable from the instant case, we need not reach the issue because of our findings, infra↩.
4. See, generally, Banoff, "Tax Distinctions Between Limited and General Partners: An Operational Approach," 35 Tax L. Rev. 1↩ (1979).
5. Though petitioner initially contended that Block's activities with regard to PPP made him liable as a general partner of PPP (a partnership in which he had no direct interest until possibly 1973), she has abandoned that position on brief. Neither party expends any effort on brief arguing the effect on petitioner's tax liability of Block's purported limited partnership interest in PPP in 1973. We assume that the $ 5.22 of deduction that would be provided by proving the existence of that interest is not here in issue. If it is, petitioner has failed to prove that Block actually owned an interest in PPP during 1973. Merely entering into evidence PPP's Form 1065 for the short taxable year ending May 31, 1973, does not suffice to prove that Block purchased an interest in PPP.↩
6. Brown v. Commissioner, T.C. Memo. 1980-267↩.