Benjamin and Myrna RAPHAN,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 452–78.

United States Claims Court.

Sept. 26, 1983.

Ralph A. Muoio, Washington, D.C., with whom were Janet R. Spragens and Caplin & Drysdale, Washington, D.C., for plaintiffs.

Ellen C. Specker, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Jr. and Stella A. Tomlinson, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

This income tax case raises issues involving interpretation of *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), and of section 752 of the Internal Revenue Code.

### FACTS [1]

#### I. *Background*

In the summer of 1969, three Virginia builders—Louis, Paul and Peter Pomponio—acquired a 17-acre tract near Crystal City, Virginia, for development of an office/apartment/shopping complex to be known as the National Center. Among the projects planned for the National Center was the James Buchanan House, an apartment building with some commercial space. The Pomponios conveyed 3.5 of the 17 acres to the James Buchanan Corporation (JBC) to be used in the construction of the Buchanan House. The land cost $2 million and was financed with a short-term loan from the American Bank.

During the summer of 1969 the Pomponios tried very hard to refinance the American loan. Among those whom they approached was a group of New York City real estate investors headed by attorney Herbert Tenzer. The Tenzer group was unwilling to make a loan but expressed an interest in making an equity investment instead. The Pomponios refused at first but when further efforts at finding a loan proved unsuccessful they returned to the Tenzer group and proposed a deal.

The Tenzer group found the project attractive. The Pomponios had obtained a commitment for a $9.4 million construction loan from the Royal National. Bank and arranged for a turnkey construction contract for slightly over $8 million, an estimated $2 million below market. The general contractor and many of the subcontractors were owned by the Pomponios. The Pomponios themselves enjoyed a good reputation because of recent successes; their financial statements showed an aggregate net worth in excess of $10 million.

The project also had drawbacks. The Pomponios' prior experience was in commercial construction whereas the Buchanan project was principally residential, a difference of no small moment. In addition, the Pomponios were proposing to use some novel construction methods, the efficacy of which had not been proven. The Tenzer group also was concerned because the project was in Virginia where they had no expertise or connections.

#### II. *The Deal*

It was eventually agreed that the Tenzer group would participate by contributing $2 million in part ($75,000) as equity and in part ($1.925 million) as a loan, with the loan convertible into equity at the option of the Tenzer group. The venture was structured as a limited partnership, Buchanan Apartment Associates (Associates). Immediately prior to closing, JBC signed the construction loan agreement with Royal National Bank. JBC then transferred title to Associates subject to Royal's deed of trust.

The interest rate on the construction loan was 14%, which exceeded Virginia's usury limit for noncorporate borrowers. Royal took the position that Associates could not hold title to the property when an advance on the construction loan was made. JBC and Associates therefore executed an agreement calling for JBC to hold nominal title to the property as required. The Pomponios and the Tenzer group agreed that JBC was to do absolutely nothing with the property aside from holding nominal title; the Pomponios passed a corporate resolution so limiting JBC's authorized activities.

While the partnership agreement required partnership checks to be signed by representatives from both the Pomponio and the Tenzer groups, the parties realized that during construction it would be cumbersome for the Pomponios to send every check to New York for countersignature. It was therefore agreed that during con-

1. The court made oral findings of fact after trial which was held on May 3–10, 1983. This opinion supplements those findings as appropriate to resolution of the legal issues discussed.

struction the signature of the Pomponios would suffice. The agreement provided that construction loan advances would be deposited in a trust account and that disbursements would be made for development of the property and for no other purpose.

Under the terms of the construction loan agreement, Royal was to make periodic advances upon a certification of satisfactory progress from the supervising architect. A Royal senior vice president, Sidney Zneimer, was responsible for approving and monitoring the advance of construction funds. He was also responsible for assuring that advances would be kept in an appropriate trust account and that disbursements from that account would be made only for the benefit of the project.

With respect to the first two construction loan advances in January and February of 1970, Associates transferred title to JBC for a few minutes at a time, just long enough to receive the funds. In March 1970, the parties decided to change procedure so as to avoid payment of real estate transfer taxes which were becoming a serious burden. Title was transferred to JBC for the duration of the construction; the deed provided that JBC was holding title as agent for Associates.

### III. *The Aftermath*

Things did not work out as planned. From the outset, the Pomponios seriously and repeatedly violated their duties to the partnership, caused JBC to take actions wholly inconsistent with its limited role as agent, and diverted construction funds to other projects and for their own benefit. The Pomponios were able to commit these misdeeds because they were bribing Sidney Zneimer, the Royal Bank senior vice president. Zneimer gave the Pomponios a free hand to use construction funds as they pleased.

During 1970 and the early part of 1971, however, the Tenzer group had no inkling that anything was amiss and, to all appearances, the Buchanan project was proceeding as planned. Cost overruns and completion delays started in the spring of 1971 and became serious by fall. While the Tenzer group blamed the Pomponios, they were still unaware that more was involved than mismanagement.

By fall of 1972, the Pomponios and their financial empire were in serious trouble. Their various projects, including the Buchanan House, were in default. The Pomponios themselves, along with Sidney Zneimer, were the subject of far-reaching grand jury investigations. In September 1972, the Tenzer group prevailed upon the Pomponios to terminate their interest in Associates. By that time, the Royal loan had been fully drawn down and JBC had permanently transferred title back to Associates. After substantial additional investments from the Tenzer group, Associates was able to complete the project. Associates still owns the Buchanan House and has operated it since its completion.

### QUESTIONS PRESENTED

The parties disagree as to what extent, if any, the plaintiffs, who are members of the Tenzer group, were entitled to deduct losses associated with the Buchanan project for the tax years 1970 and 1971. The case presents two separate questions. First, there is a dispute as to whether Associates or JBC is entitled to claim the losses. Resolution of this issue turns on whether JBC merely served as agent for Associates or whether JBC must be treated as the owner of the property.

Second, the government argues that even if Associates was entitled to the construction period losses, the limited partners may deduct such losses only up to their basis, an amount equal to their contribution. 26 U.S.C. §§ 704, 722 (1976). Plaintiffs argue that pursuant to section 752 their basis is increased significantly by virtue of the Royal loan. That section allows partners an increase in basis for a share of any partnership debt as to which none of the partners is personally liable. Here the Pomponios guaranteed the Royal loan. The government argues that this amounts to personal liability under section 752, while plaintiffs argue that it does not.

## DISCUSSION

### I. *The Principal/Agent Issue*

#### A.

■ The person or entity holding title to property must generally bear the tax consequences of transactions involving the property. *See, e.g., Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Harrison Property Management Co. v. United States,* 201 Ct.Cl. 77, 475 F.2d 623 (1973), *cert. denied,* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974). However, a property owner may transfer nominal title to an agent, retaining equitable ownership and the tax consequences that go with it. *See Carver v. United States,* 188 Ct.Cl. 202, 213–14, 412 F.2d 233, 239–240 (1969). Where the agent and principal are affiliated, however, it may be difficult to determine whether there is a true agency relationship or whether a common principal is merely using one controlled entity rather than the other to deal with the property.

The Supreme Court addressed this issue in *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). *National Carbide* involved a contract between a corporation (Airco) and its wholly owned subsidiaries. The subsidiaries were to act as agents operating certain plants and selling their output. *Id.* at 425, 69 S.Ct. at 728. Airco was to provide working capital, management services and office facilities; the subsidiaries were to turn over to Airco substantially all profits. *Id.* From these circumstances and others recited by the Court, *Id.* at 425–26, 69 S.Ct. at 728–29, it was clear that the subsidiaries were wholly controlled by Airco.

The Court concluded that no true principal/agent relationship existed, noting that "[o]wnership of a corporation and the control incident thereto can have no different tax consequences when clothed in the garb of agency than when worn as a removable corporate veil." *Id.* at 430, 69 S.Ct. at 730. The Court disregarded the agency agreement, concluding that "[s]uch an agreement is entirely consistent with the corporation-sole stockholder relationship whether or not

any agency exists." *Id.* at 436, 69 S.Ct. at 733. In reaching its decision, the Court formulated the test for when a controlled entity can properly be treated as an agent: "If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case." *Id.* at 437, 69 S.Ct. at 734.

*National Carbide* thus stands for the unremarkable proposition that purported agency agreements between entities under common control will not generally be given effect. Because such entities will act in accordance with the wishes of their common principals in any case, the agency contract adds nothing to the relationship and therefore lacks substance. Or, put somewhat differently, because the same parties control both sides of the purported agency agreement, the agreement is likely to reflect legal fictions not economic realties and should generally be ignored. A recent decision of the Fifth Circuit, interpreting *National Carbide,* emphasizes this point:

> Closely-held corporations often function as agents or surrogates for their owners.... If a taxpayer could, by the simple expedient of relying upon characteristics common to all such corporations, avoid tax liability, the separate entity regime would collapse. To prevent abuse, the taxpayer should be required to show more than those agency attributes that arise naturally from ownership and control of the corporation—he should be required to show that an agency relationship could exist independent of such ownership and control. This is precisely what ... *National Carbide* requires.

*Roccaforte v. Commissioner,* 708 F.2d 986, 990 (5th Cir.1983), *quoted with approval in Vaughn v. United States,* 3 Cl.Ct. 316, 322 (1983) (MILLER, J.).

#### B.

■ 1. The crucial inquiry under *National Carbide* is the nature of the relationship between the agent, JBC, and the principal, Associates. If the two entities are affiliated, the burden is on the taxpayer to

show, in the words of *Roccaforte,* "that an agency relationship could exist independent of such ownership and control." 708 F.2d at 990. The two entities can be affiliated in one of two ways. First, the principal can own a controlling interest in the agent; that was the situation in *National Carbide. See also Moline Properties,* 319 U.S. at 437, 63 S.Ct. at 1133; *Harrison Property Management Co.,* 201 Ct.Cl. at 80, 475 F.2d at 624. Second, the entities can be affiliated because the same parties own a controlling interest in both. *See Vaughn,* 3 Cl.Ct. at 316–17; *Roccaforte,* 708 F.2d at 987; *Jones v. Commissioner,* 640 F.2d 745, 747–48 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981); *Taylor v. Commissioner,* 445 F.2d 455, 456 (1st Cir.1971).

■ There was no affiliation of the first type here; Associates did not have any interest in JBC and JBC was not a partner in Associates. Nor was there, at least on paper, the second type of affiliation, because the same parties were not in control of the two entities. JBC, the agent, was controlled entirely by the Pomponios; Associates, the principal, was owned equally by the Pomponios and the Tenzer group, with neither party holding a controlling interest. *See* n. 4 *infra.* This does not remove the concerns expressed in *National Carbide* which teaches that we must examine the reality of the situation, not merely the manner in which the papers are drafted. The question is whether the Tenzer group and the Pomponios were so closely aligned in interest that the Tenzer group could exercise control over JBC through the Pomponios.

■ There is little doubt that JBC was controlled by the Pomponios alone and not at all by the Tenzer group. The parties had

never done business before; their relationship was established entirely at arm's length and after vigorous bargaining. There were no personal loyalties or any established course of dealing which would have assured the Tenzer group control over JBC through the Pomponios. To the contrary, the Pomponios used their complete control over JBC to steal the Tenzer group blind. It follows then that JBC and Associates were not under common control.

■ The fact that principal and agent were not commonly controlled entities goes a long way toward allaying the concerns expressed in *National Carbide.* The agency agreements in *National Carbide* yielded a matrix of relationships which tracked precisely those already existing between the various entities; the agreement was a meaningless piece of paper. Not so here. JBC was controlled only by the Pomponios and absent the agency agreement it owed no duty to Associates or the Tenzer group. By permitting Associates to entrust title to the property to an agent not under their control, the Tenzer group investors exposed themselves to significant risks which were inherently absent from *National Carbide* and its progeny. That the Pomponios caused JBC to violate the agency agreement to the detriment of Associates and the Tenzer group proves that the agreement had substance and was not merely an attempt to redefine on paper an already existing relationship.

An additional factor distinguishing this case from *National Carbide* is the exceedingly limited role to be played by JBC as agent. The agency agreement provided that JBC would merely hold nominal title to the property and do nothing else with it;[2]

---

**2.** The operative portion of the agency agreement provided as follows:

    1. Agent acknowledges that Principal is, and during the entire existence of this agreement shall remain, the true and actual owner of the Property.

    2. Solely for the purposes of enabling Principal to obtain the Construction Loan for the construction of the improvements on the Property and the advances to be made under the Construction Loan in accordance with

the commitment of the Royal National Bank of New York, Agent agrees as an agent to hold nominal title to the Property for the benefit of Principal for so long and at such times as the Principal shall request and direct during the course of the construction of the improvements on the Property. In that connection, the Principal may execute and deliver, and Agent agrees to accept from time to time, a deed conveying to Agent as agent nominal legal title to the Property. Upon

a corporate resolution so limited JBC's authorized actions. Record notice of JBC's agency status was given by an appropriate inscription on the deed from Associates to JBC; major creditors were given actual notice; real estate tax and title insurance records reflected JBC's status as agent for Associates; insurance against risks during construction was taken out in the name of Associates; rental applications and leases for the apartments were all in the name of Associates; Associates and not JBC was to be liable for costs and expenses incurred in connection with the project. Unlike the situation in many cases, *see, e.g., Vaughn,* 3 Cl.Ct. at 322, the agency agreement was not hidden from anyone and the principal lender, Royal, had actually agreed to help monitor it. Moreover, the narrow purpose of the agency agreement—holding nominal title to avoid usury problems—could have been performed equally well by a corporation unrelated to any of the parties.

At bottom, the inquiry under *National Carbide* is whether the parties transferred to JBC more than mere nominal title, namely actual ownership of the property. The record compels a finding that they did

not. Having bargained for an equity position in the project and put up $2 million, there is simply no reason the Tenzer group would have consented to transfer ownership of the property to JBC, an entity in which they did not own stock, held no officer or director positions, and over which they had absolutely no control apart from the agency agreement. Taxpayers had no intention whatever that JBC do more than passively hold title while Associates dealt with the property as owner. Such a limited role is entirely consistent with JBC's status as agent. *See Schlosberg v. United States,* 81–1 U.S.Tax Cas. ¶ 9272 (E.D.Va.1981). As noted earlier, the fact that the agency agreement was grossly violated merely establishes that it had substance and was not redundant of existing relationships between the parties.

■■■ 2. Defendant argues that the agency agreement should nevertheless be disregarded because JBC took various actions inconsistent with its terms and more consistent with the status of a principal.[3] This argument must be rejected because these actions were taken without the approval of the Tenzer group and hence with-

request of the Principal, Agent shall execute and deliver a deed reconveying to Principal legal title to the Property.

3. Agent's sole function during the existence of this agreement shall be to hold nominal legal title to the Property for the benefit of Principal under and subject to the Principal's written directions and instructions. However, it is anticipated that the lenders referred to above or other persons may require that they be furnished with various legal documents executed by the Agent as such holder of legal title to the Property. In such event, Principal shall prepare such documents and Agent shall execute the same in accordance with Principal's directions. Agent shall have no discretionary authority to exercise any control over the Property or to execute any written instruments in any way relating to the Property except as set forth above, it being expressly understood that Agent has no real interest in or duties or responsibilities in respect to the Property except to perform ministerial tasks at the written direction and instruction of Principal. Agent shall immediately forward to Principal all correspondence or other written materials relating to the Property which Agent receives.

4. All sums advanced under the Construction Loan, as well as any other funds received in connection with the construction of the building on the Property shall be delivered to, for the account of, or in accordance with the instructions of Principal. Agent may under no circumstances retain or possess any advances or portion thereof, nor any other funds or portion thereof, and will have no obligation to pay any expenses in connection with its carrying out of its functions and duties under this agreement. All expenses incurred by or for the account of Agent in connection with its carrying out its duties and functions under this agreement shall be paid by Principal.

3. Unbeknownst to the Tenzer group, the Pomponios in the name of JBC defended, initiated and settled lawsuits; negotiated for financing; assigned construction funds as collateral for loans to themselves and their wives; diverted construction funds to unrelated projects and for their personal use; repealed the corporate resolution which limited JBC's authority to holding passive title as agent for Associates; and generally held JBC out as the fee owner of the property whenever it suited them to do so.

out the consent of JBC's principal, Associates.[4] An agent cannot, by its own unauthorized acts, bootstrap itself into the role of principal. *See* Restatement (Second) of Agency § 398 (1958). If JBC had purported to sell the property in violation of the agency agreement, the transaction would not have been given effect as between JBC and Associates. *See id.* § 423 comment d. There appears to be no reason to give JBC's actions such preclusive effect for purposes of the tax law. Since the issue under *National Carbide* is whether Associates transferred more than nominal title to JBC, that issue cannot be resolved by reference to JBC's unauthorized acts.

■ Defendant also argues that the Tenzer group should have known of JBC's actions and therefore ought to be bound by them. Insofar as defendant is suggesting that the Tenzer group actually knew about JBC's actions, the court finds to the contrary. It is clear that the Tenzer investors did not know; that they were the victims of a sophisticated fraud involving the bribery of a key bank official; that they suffered for their lack of knowledge; and that they would have acted forcefully to stop the Pomponios had they known that they were causing JBC to act in a manner inconsistent with its limited agency status.

Defendant, however, may be suggesting that the Tenzer group did not do enough to prevent JBC from straying and therefore should not be heard to argue that JBC's actions were unauthorized. If that argument can ever be persuasive, it is not here. The parties implemented a series of controls which would give the world notice of the agency agreement and, at the same time, assure that JBC would act in accordance

therewith.[5] That these controls failed is not conclusive. There must always be some trust in one's business associates; the court will not hold that partners must always suspect each other of wholesale fraud. While the Tenzer partners no doubt rue their failure to monitor the Pomponios more closely, the court finds that the steps they took to protect themselves were adequate. There is no basis for holding that they implicitly sanctioned JBC's ultra vires actions.

## II. *The Section 752 Issue*

### A.

Having established that plaintiffs, as partners in Associates, may deduct the losses connected with the construction of the Buchanan Apartments raises the question of how much they can deduct. The answer turns on interpretation of Internal Revenue Code section 752 and the regulations promulgated thereunder which comprise "[o]ne of the most complicated, and least understood, portions of partnership tax law." *Mertens Law of Federal Income Taxation, Code Commentary* § 752.1 (1983) [hereinafter cited as *Mertens*].

The general rule is that a partner is entitled to deduct partnership losses in accordance with the partnership agreement, but only up to his adjusted basis. 26 U.S.C. § 704 (1976). The basis of a partner's interest acquired by a contribution of money or property is the amount of such money or the adjusted basis of such property. *Id.* § 722. Section 752, in turn, provides that a partner may increase his basis to the extent he assumes liability for partnership debts. *Id.* § 752(a).

---

4. The partnership was so structured that neither faction could act without the concurrence of the other. The Pomponios alone therefore could not authorize JBC to act for Associates. Indeed, most of the things the Pomponios caused JBC to do were in violation of their fiduciary duty to their partners.

5. The Tenzer group notified the principal creditors of JBC's agency status; they discussed with Sidney Zneimer the bank's responsibility to keep loan advances in trust; they received and reviewed copies of the contractor's requests for loan advances, together with supporting documentation; they discussed the project with Louis Pomponio who visited New York on a weekly basis; twice a month they reviewed construction progress reports prepared by the Pomponios; about once a month they sent a representative to visit the work site; and periodically they reviewed endorsements by the title insurer to determine whether any liens were placed on the property or whether taxes were in arrears.

The regulations promulgated under section 752 deal more specifically with limited partnerships. They provide that limited partners are generally entitled to share in losses only to the extent of their contribution. However, where there is a partnership debt as to which none of the partners is personally liable, all of the partners, including the limited partners, are entitled to a step up in basis. Treas.Reg. § 1.752–1(e) (1956).

As will be recalled, the Royal loan agreement was signed by JBC, not the partnership, in order to comply with Virginia's usury laws. While it took the property subject to Royal's security interest, the partnership never assumed liability. However, the Pomponios, who were general partners in Associates, guaranteed the loan. The guarantee was a prerequisite to obtaining the loan which, in turn, was *sine qua non* of the deal between the Tenzer group and the Pomponios.

The government argues that because the Pomponios guaranteed the loan, they had "personal liability" under Treas.Reg. § 1.752–1(e) and the Tenzer group partners were not entitled to a step up in basis on account of the Royal loan. Plaintiffs respond that the guarantee was not the type of obligation that would make the Pomponios "personally liable" under Treas.Reg. § 1–752.1(e) so as to preclude the remaining partners from sharing the increase in basis.

### B.

The tax treatment of partnership income and losses generally turns on the terms of the partnership agreement and the law governing the rights and obligations of partners. Section 704 expressly relies on the partnership agreement to define the incidents of partnership for tax purposes. Section 752 follows this pattern. For example, the section allows a partner an increase in basis for a portion of partnership debts for which he becomes liable. The increase in basis is not for the entire amount of the partnership liability, but only for the partner's share of the losses as provided in the partnership agreement. Treas.Reg.

§ 1.752–1(e). Yet each general partner is liable to creditors for the full amount of each partnership debt. *Mertens* § 752.1. "However, because of the right of contribution among the partners, the partners have been considered as economically burdened only with their share of the partnership debt." *Id.*

When addressing the rights of limited partners, section 752 and the regulations continue reliance upon the partnership agreement. Limited partners are entitled to share in partnership losses up to the amount of their contribution or such greater amount as they are obligated to contribute pursuant to the partnership agreement. Treas.Reg. § 1.752–1(e). Where no partner is personally liable, as in the case of a nonrecourse debt secured by partnership property, the regulation provides that all partners, including limited partners, share in the step up in basis in the same proportion as they share *profits*. The rationale behind this provision is that when partnership property is subject to foreclosure upon default of the debt, each partner's interest in the profits of the partnership is put in jeopardy. Once again, then, the benchmark for determining a partner's step up in basis is the partnership agreement.

Review of these provisions suggests that tax treatment of partnership gains and losses turns on the partners' rights and responsibilities *as partners,* which are governed by the partnership agreement and by partnership law. Partners may act vis-a-vis the partnership in capacities other than as partners, e.g., as employees, creditors or lessors. 26 U.S.C. § 707(a) (1976). There is no reason a partner cannot assume liability for partnership debts in a capacity other than as a partner; indeed, the regulations specifically contemplate that he can. Treas.Reg. § 1.752–1(f). The test is whether, in assuming such liability, the partner is securing rights and assuming responsibilities which are separate from, and independent of, his role as a partner.

Guaranteeing a nonrecourse partnership debt, as in this case, establishes

such separate rights and responsibilities. Since the debt is nonrecourse, non-guaranteeing partners can ignore it if the partnership defaults; the guaranteeing partner must pay it all. If he does so, he steps into the shoes of the lender and is subrogated to its rights and remedies, including the right to foreclose against the collateral. *See Putnam v. Commissioner,* 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956); *First National City Bank v. United States,* 210 Ct.Cl. 375, 389–90, 537 F.2d 426, 434–35 (1977); *In re Ollag Construction Equipment Corp.,* 578 F.2d 904, 908 (2d Cir.1978). Foreclosure on the collateral by a subrogated partner has precisely the same effect on the partnership as foreclosure by an unrelated creditor: it diminishes the interest of every partner. The guaranteeing partner becomes effectively a creditor vis-a-vis the partnership, with rights antithetical to his status as a partner. Therefore, the guaranteeing of a partnership debt does not make the guaranteeing partner "personally liable" under Treas.Reg. § 1.752–1(e) and does not preclude the remaining partners from sharing in the step up in basis on account of such debt.[6]

 This ruling does not, as defendant suggests, permit circumvention of section 752 through artful draftsmanship. A different case is presented where the guaranteeing partner is assured (by the partnership agreement or otherwise) that he will not, in fact, have to bear the full burden of the guarantee. When a party contracts with an affiliated entity there is always the possibility that the documents will represent legal fictions and not reality. *See, e.g., National Carbide Corp.,* 336 U.S. at 436, 69 S.Ct. at 733; *Spector v. Commissioner,* 641 F.2d 376, 379 (5th Cir.), *cert. denied* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981). That is not sufficient reason for refusing to give effect to instruments that do reflect reality.

 Here, the Tenzer group would have gladly allowed the Pomponios to remain liable on the guarantee if the debt had exceeded the value of the security. The Pomponios for their part would have cheerfully foreclosed on the property and frozen out the Tenzer group had they been able to do so. In such circumstances, the guarantee agreement reflected reality and was not merely a piece of clever draftsmanship to circumvent section 752.

## CONCLUSION

JBC was the agent of Associates and plaintiffs as partners of Associates are entitled to the tax benefit of the losses for 1970 and 1971. No partner had personal liability under the Royal National Bank loan and therefore each of the partners is entitled to an appropriate step up in basis under Treas. Reg. § 1.752–1(e).

The parties shall prepare a stipulation setting forth the amount of plaintiffs' judgment, together with interest and costs. The clerk is directed to enter judgment in accordance with any such stipulation.

If the parties are unable to prepare and file such a stipulation by November 2, 1983, the case is set for a status hearing on November 3, 1983, at 10:00 a.m. EST, in Courtroom 4, Fifth Floor, National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005.

**6.** This interpretation dovetails with decisions of the Tax Court in *Block v. Commissioner,* 41 T.C.M. (CCH) 546 (1980), and *Brown v. Commissioner,* 40 T.C.M. (CCH) 725 (1980), which held that limited partners' guarantee of partnership debts did not entitle them to a step up in basis since the guarantees were not called for by the partnership agreement. These cases interpreted Treas.Reg. § 1.752–1(e) consistent with the rationale that liabilities of partners may only be considered in determining basis under section 752 to the extent they are specified in the partnership agreement. *See also Danoff v. United States,* 499 F.Supp. 20 (M.D. Pa.1979).