KASHIWA, Circuit Judge.
 

 Appeal from a judgment of the United States Claims Court, 3 Cl.Ct. 457 (1984), holding that: (1) James Buchanan Corporation (JBC) was the agent of Buchanan Apartment Associates (Associates) and Benjamin and Myrna Raphan (Raphan) as partners of Associates are entitled to the tax benefit of losses for 1970 and 1971, and (2) no general partner of Associates had personal liability under a construction loan and therefore each of the partners, including the Raphans as limited partners, is entitled to include the debt on that loan in the tax basis of their partnership interests. We affirm in part and reverse in part.
 

 Background
 

 The principal events and agreements that have led to the present controversy are set forth in the trial court’s opinion, 3 Cl.Ct. at 459-60. We list here only those necessary to an understanding of this opinion.
 

 The Pomponio brothers (Pomponios) planned to construct an apartment building to be known as the James Buchanan House (Buchanan House). The Pomponios transferred a 3.5 acre parcel of land to JBC, a corporation owned by the Pomponio family. The cost of and mortgage on that parcel were each $2 million.
 

 JBC entered a contract with Pomponioowned National Realty & Construction Co., Inc. (National Realty) to construct the building, and obtained a $9.4 million loan commitment for a permanent mortgage effective when construction was complete.
 

 JBC had difficulty obtaining a construction loan, and the lenders of the $2 million loan were pressing for payment. The Pomponios sought a loan from the Tenzer group, a New York law firm (Tenzers). The Tenzers would not make the loan but were interested in an equity investment. It was agreed that Buchanan House would be developed by a basically 50-50 partnership of the Pomponios and the Tenzers to be called Associates. The Tenzers contributed $2 million and the Pomponios contributed the land, subject to the $2 million purchase mortgage, and the construction contract, the value of which was understood to be $2 million.
 

 The Tenzers, which included the Raphans, were active partners in Associates.
 
 [1]
 
 The Pomponios were co-partners in Associates, the sole owners of JBC, and the sole owners of National Realty.
 

 Royal National Bank (Royal Bank), the lender of the $9.4 million construction loan, charged 14 percent interest, which exceeded Virginia’s usury limit for noncorporate borrowers such as Associates. To avoid the usury restriction, JBC was used as the borrower, and JBC and Associates executed an agreement in which JBC: “agree[d] as an agent to hold nominal title to the Property for the benefit of Principal [Associates] for so long as and at such times as the Principal shall request and direct during the course of the construction of the improvements on the Property.” The agreement also provided that JBC’s “sole function during the existence of this agreement shall be to hold nominal legal title to the Property for the benefit of the Principal under and subject to the Principal’s written directions and instructions,” and that JBC:
 

 shall have no discretionary authority to exercise any control over the Property or to execute any written instruments in any way relating to the Property except as set forth above, it being expressly understood that Agent [JBC] has no real interest in or duties or responsibilities in
 
 *882
 
 respect to the Property except to perform ministerial tasks at the written direction and instruction of Principal. Agent shall immediately forward to Principal all correspondence or other written materials relating to the Property which Agent receives.
 

 * * * * * *
 

 All sums advanced under the Construction Loan, as well as any other funds received in connection with the construction of the building on the Property shall be delivered to, for the account of, or in accordance with the instructions of Principal. Agent may under no circumstances retain or possess any advances or portion thereof, nor any other funds or portion thereof, and will have no obligation to pay any expenses in connection with its carrying out of its functions and duties under this agreement. All expenses incurred by or for the account of Agent in connection with its carrying out its duties and functions under this agreement shall be paid by Principal.
 

 Finally, it was provided that JBC “shall receive from Principal as compensation for the services to be rendered by Agent hereunder the sum of $1 thousand to be paid upon the completion of construction of the building and the funding of the Permanent Loan.” A corporate resolution of JBC limited its authorized activities to holding “bare legal title to the property as agent for * * * [Associates] and to act as agent and nominal title holder” for Associates.
 

 Because the Tenzers perceived substantial risks, it was agreed that $1,925,000 of their $2 million would be converted from a contribution to Associates’ capital to a loan to JBC. The loan bore 12.47 percent interest, was secured by a second mortgage on the property, was guaranteed by the Pomponios, and could be converted, after two years, to an equity interest in Associates.
 

 On December 16, 1969: (1) the Tenzers contributed $75,000 for their limited partnership interests and lent JBC $1,925,000, (2) the $2 million total was used to pay the existing mortgage on the land, (3) Royal Bank agreed to lend JBC up to $9.4 million as construction financing, (4) the Pomponios personally guaranteed the $9.4 million loan, and (5) JBC deeded the property to the partnership, which took the property subject to all liabilities, but assumed no other liability.
 

 On January 28 and again on February 15,1970, Associates deeded the property to JBC, an advance was received from Royal Bank, and JBC deeded the property back to Associates. Those transfers required payment of transfer taxes. To avoid those taxes, the parties in late 1970 transferred title to JBC as “agent”.
 

 For convenience, the Tenzers waived their right to sign partnership checks during construction.
 

 In December 1971, JBC permanently transferred the property to Associates. By the fall of 1972, Buchanan House was in default, and the Pomponios and a Sidney Zneimer (an officer of Royal Bank), were investigated by a grand jury. In September of 1972, the Tenzers persuaded the Pomponios to terminate their interest in Associates. After additional investments by the Tenzers, Associates completed the project. It owns and operates Buchanan House.
 

 The Commissioner of Internal Revenue, having determined that losses claimed by Associates were those of JBC, disallowed the share of those losses claimed by the Raphans. The Raphans paid the resulting deficiency and filed claims for refund.
 

 Claims Court Decision
 

 The Raphans sued in the Claims Court for refund of $2,865.65 paid as income tax, interest and penalties, plus accrued interest and costs, for taxable years 1970 and 1971. The government said JBC did not qualify as a true agent under
 
 National Carbide Corp. v. Comm’r,
 
 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), and the losses were therefore those of JBC, not those of Associates. The government further asserted that if the losses were attributable to Associates, the Raphans could not deduct them because they had an insufficient
 
 *883
 
 basis in their partnership interests under the Treasury Regulations in view of the Pomponios’ guarantee of the construction loan.
 

 The Claims Court concluded that JBC and Associates were not commonly controlled, and that the agency agreement therefore should be given effect. The Claims Court further concluded that because the Pomponios did not guarantee the loan in their capacity as partners, that guarantee did not prohibit the Raphans from including the losses in the tax basis of their interests.
 

 Issues
 

 1. Whether the Claims Court erred in determining that JBC was, for tax purposes, a true agent of Associates.
 

 2. Whether the Claims Court erred in determining that the Pomponios’ guarantee did not result in any “personal liability” for the loan.
 

 3. Whether the government based its case on evidence obtained in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.
 

 OPINION
 

 (1)
 
 Principal/Agent Relationship
 

 In reviewing findings of fact, this Court is required to apply the clearly erroneous rule. Rule 52(a), Federal Rules of Civil Procedure.
 
 See Vaughn v. United States,
 
 740 F.2d 941, 945 (Fed.Cir.1984);
 
 Heisig v. United States,
 
 719 F.2d 1153, 1158 (Fed.Cir.1983). We do not find the Claims Court’s finding of fact that JBC and Associates were not under common control to have been clearly erroneous.
 

 Generally, the title holder must bear the tax consequences of transactions involving the property.
 
 See, e.g., Moline Properties, Inc. v. Comm’r,
 
 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943);
 
 Harrison Property Management Co. v. United States,
 
 475 F.2d 623, 201 Ct.Cl. 77 (1973),
 
 cert. denied,
 
 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974). Nominal title may be transferred to an agent, allowing the transferor to retain equitable ownership and its tax consequences.
 
 See Carver v. United States,
 
 412 F.2d 233, 239-40, 188 Ct.Cl. 202 (1969). However, where the agent and principal are affiliated, it becomes necessary to determine whether a common principal is merely choosing which of two controlled entities it will employ to deal with the property.
 
 See National Carbide,
 
 336 U.S. at 437, 69 S.Ct. at 734.
 

 The Claims Court noted that common control may legally exist in either of two ways, the principal can own a controlling interest in the agent or the same parties may own or control. both principal and agent, and that where neither form of common control is present, the concerns expressed in
 
 National Carbide
 
 are not applicable.
 

 Finding that Associates did not control JBC and JBC did not control Associates, the Claims Court concluded that the first form of control did not exist. Concluding that the second form did not exist, the Claim Court said, “JBC, the agent, was controlled entirely by the Pomponios; Associates, the principal, was owned equally by the Pomponios and the Tenzer group, with neither party holding a controlling interest.” 3 Cl.Ct. at 462.
 

 The government’s assertion that the Pomponios as general partners totally dominated Associates, and that the Tenzers exercised no meaningful control, finds no support in the record. The government quotes the Claims Court’s oral statement that “there was an intended sharing of control”, implying that the Claims Court found the parties’ intention to have gone unfulfilled. However, the government disregards the Court’s three sentences immediately following:
 

 That looking at the share of control one cannot look at every week and every day of the partnership as a separate measure. One must look at their intended duration of the partnership ... which included not only construction of the building but also the rent from the management of the building. And that in
 
 *884
 
 that light there was a sharing of control although at various parts of the project one set of partners had more active participation in that control than the other set of partners.
 

 As the Claims Court recognized,
 
 National Carbide
 
 sets forth “six factors” to be considered in determining whether a particular agency arrangement should be respected:
 

 Whether the corporation [1] operates in the name and for the account of the principal, [2] binds the principal by its action, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. [6] Its business purpose must be the carrying on of the normal duties of an agent. [336 U.S. at 437, 69 S.Ct. at 734.]
 

 3 Cl.Ct. at 462. The Claims Court correctly reviewed each of those “factors” in determining that a principal-agency relationship existed between Associates and JBC.
 

 (2)
 
 Personal Liability
 
 — Section
 
 752
 

 (a)
 
 Introduction
 

 Pursuant to Sec. 701,
 
 [2]
 
 a partnership does not pay federal income tax. The individual partners do.
 
 See
 
 §§ 702, 704(a). The partnership loss that a partner may deduct is limited to that partner’s adjusted basis in his partnership interest, determined at the end of the partnership’s taxable year.
 
 See
 
 § 704(d). The basis of a partnership interest acquired by contribution to a partnership is the value of the contributed money or property.
 
 See
 
 § 722.
 

 A partner's basis of his partnership interest is subject to adjustments. Under Sec. 752(a), an increase in a partner’s share of partnership liabilities is considered a contribution of money. Such a contribution results in an increase in the partner’s basis of his partnership interest.
 
 See
 
 § 722. As explained in the Regulations:
 

 For example, partnership AB borrows $1,000. If A and B are equal partners, the basis of the partnership interest of each is increased by $500 since each is considered under section 752(a) to have contributed that amount of money to the partnership.
 

 Treas.Reg. § 1.752-1(a)(1).
 
 See generally Laney v. Comm’r,
 
 674 F.2d 342, 345-46 (5th Cir.1982).
 

 The Treasury Regulations govern the allocation of a partnership’s liabilities. Sec. 1.752-1(e) provides:
 

 (e)
 
 Partner’s share of partnership liabilities.
 
 A partner’s share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In the case of a limited partnership, a limited partner’s share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits.
 

 When no partner has any personal liability for a partnership debt, therefore, all partners, including limited partners, “share” that debt in the proportion they share profits, and each partner’s basis reflects his debt share. When, however, a
 
 *885
 
 partner has “any personal liability” for that debt, the general partners share in it. The limited partners’ share, if at all, will depend on the difference between his actual contribution to the partnership and the total contribution that he is “obligated” to make under the
 
 limited partnership agreement.
 

 Personal liability for a debt (“recourse indebtedness”) means all the debt- or’s assets may be reached by creditors if the debt is not paid. Personal liability is normally contrasted with limited liability (“nonrecourse indebtedness”), against which a creditor’s remedies are limited to particular collateral for the debt. Indeed, a partner’s guarantee of a partnerships’ “nonrecourse debt” makes him personally liable because the partner has exposed his assets to pay the debt if the partnership defaults, precluding the limited partners from sharing in the debt.
 
 See
 
 MCKEE, NELSON & WHITMIRE, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶ 8.02[3] (1977); WILLIS, PENNELL & POSTLEWAITE, PARTNERSHIP TAXATION § 45.04 (3d ed. 1984).
 

 (b)
 
 The Guarantee
 

 The Claims Court held that the Pomponios guaranteed the construction loan in a nonpartner capacity, and assumed that personal liability of partners is to be accounted for in allocating basis only if that liability is incurred in their capacity as partners. It reasoned that if the general partners, the Pomponios, were called on to meet their guarantee, they would become creditors of the partnership, and viewed that status as distinct from their relationship as partners.
 

 The view that a partner cannot guarantee partnership debt in his capacity as partner because he then becomes a creditor is insupportable. A general partner, who is liable
 
 as such
 
 for the recourse debts of the partnership, has incurred that liability in his capacity as partner. That a general partner compelled to pay those debts also becomes a creditor does not conflict with his continuing liability as general partner.
 
 See Security-First Nat’l Bank of Los Angeles v. Lutz,
 
 322 F.2d 348, 350 (9th Cir.1963).
 
 See also
 
 UNIFORM PARTNERSHIP ACT §§ 18(a)-(c) and 40(b). Acquisition of creditor status, after meeting the guarantee, does not mean that the guaranteeing general partner did not make the guarantee, and thus incur the liability in his capacity as partner.
 

 The Regulations provide that the capacity in which a partner acts is to be determined, not by
 
 a priori
 
 reasoning, but by examination of “the substance of the transaction.”
 
 See
 
 Treas.Reg. § 1.707-1(a). Examining the substance here establishes that the Pomponios did not act at arm’s length in guaranteeing the construction loan. They did not charge Associates for the guarantee, as would an unrelated person, nor did Associates agree to pay the Pomponios interest if they were called upon to meet their guarantee.
 

 The Pomponios acted not as unrelated guarantors or creditors might, but in guaranteeing the loan they acted in their capacity as partners. Before the Tenzers were involved, the Pomponios intended to construct Buchanan House on land held by JBC, their own corporation. The Tenzers supplied the needed money on condition that they would become partners. The Pomponios thus guaranteed the construction loan so that they could profit from that project through their resulting partnership interests. As the Claims Court found: “The guarantee was a prerequisite to obtaining the loan, which, in turn, was
 
 sine qua non
 
 of the deal between the Tenzer group and the Pomponios.” 3 Cl.Ct. at 465.
 

 The Raphans’ argument that the guarantee’s sole purpose was to enable JBC’s no-profit sale of its property to Associates for the $2 million to pay the mortgage is without merit. Paying off that mortgage was an indivisible part of the entire plan under which Associates would construct and own the Buchanan House.
 

 That the guarantee was not mentioned in the partnership agreement is insignificant. A partnership agreement does not cover every conceivable act the partners might
 
 *886
 
 take in the course of their partnership activity. Moreover, the guarantee was known to the Tenzers. It is common, because of the risk, for lenders to refuse a construction loan to a closely held corporation without the principals’ personal guarantee.
 
 See, e.g.,
 
 R.K. LIFTON, PRACTICAL REAL ESTATE: LEGAL, TAX AND BUSINESS STRATEGIES 210 (1979). The Tenzers, sophisticated real estate investors, obviously knew , of that common practice. That Tengran Corp., also a general partner, did not join in the guarantee is equally insignificant. As merely a shell corporation, Tengran Corp.’s guarantee would have been worthless.
 
 See Roccaforte v. Comm’r,
 
 77 T.C. 263, 269 (1981),
 
 rev’d on other grounds,
 
 708 F.2d 986 (5th Cir.1983).
 

 The Raphans contend that a guarantee can never create personal liability, under the Regulations, because it is only a conditional or secondary liability. The contention is directly contrary to this Court’s conclusion in
 
 Vaughn
 
 that the partners’ personal guarantees of partnership debt in
 
 Roccaforte
 
 and
 
 Ourisman v. Comm’r,
 
 82 T.C. 171 (1984), made those “partners * * * personally liable on the mortgage notes.” 740 F.2d at 947 n. 5. The Raphans’ contention confuses unrelated concepts. The first concept involves personal liability (creditor can reach all debtor’s assets) and limited liability (creditor can reach only specific assets). The second concept involves primary and secondary liability, which merely refer to the order in which a creditor must pursue his remedies.
 

 Under the guarantee, a creditor could reach all the Pomponios’ assets if Associates defaulted. The loan was recourse as against JBC, and JBC consequently was personally liable for that loan. Associates, however, took the loan subject to existing liabilities, but did not assume those liabilities. Therefore, the Pomponios personally guaranteed a loan that was nonrecourse against Associates and thus, became personally liable, regardless of whether they were also primarily liable.
 
 [3]
 

 The Raphans’ reliance on
 
 Brand v. Comm’r,
 
 81 T.C. 821 (1983), is misplaced.
 
 Brand
 
 involved Sec. 465 which deals with accounting methods, not with the issues presented here.
 
 See
 
 Kalish and Rosen,
 
 The Risky Basis for Partnership Allocations,
 
 38 Tax Law. 119, 137-151 (1984).
 

 The Pomponios, as general partners, were personally liable for the construction loan when they guaranteed its payment. The Raphans, as limited partners, do not share in that liability.
 

 (3)
 
 Alleged Rule 6(e) Violation
 

 The Claims Court properly denied the Raphans’ motion to suppress certain documentary evidence.
 

 Certain government exhibits, business documents relating to Buchanan House, were obtained from a grand jury empaneled in 1972 to investigate the Pomponios’ affairs. The Raphans say that without these exhibits, the government would have no case.
 

 The Raphans served interrogatories on the government requesting that it identify or produce every document it possessed having any relation to Buchanan House. In response, the government acknowledged existence of such documents, but moved for denial of their discovery, primarily on the ground that they had been obtained by grand jury subpoena and access to them was limited by Rule 6(e) of the Federal Rules of Criminal Procedure.
 
 [4]
 

 
 *887
 
 The Raphans opposed the motion, arguing (1) the documents were not covered by Rule 6(e) because they were sought for their intrinsic value; not to learn what transpired before the grand jury; and (2) the grand jury had long since been terminated.
 

 The Claims Court having denied the government’s motion, the government conducted a fifteen month search, located over 1,600 documents, and turned them over to the Raphans. The government identified 200 documents as its exhibits and amended its pretrial order accordingly. The Raphans then opposed admission of those exhibits because they were obtained in violation of Rule 6(e).
 

 The Raphans are ill-positioned to oppose admission of the exhibits: (1) they engineered the disclosure of which they complain; (2) they successfully opposed the government’s motion on the ground that the documents were
 
 not
 
 subject to Rule 6(e); (3) they caused the government substantial expense in searching for and delivering 1,600 documents to them; and (4) they obtained the benefits of that search.
 

 The Raphans’ reliance on
 
 United States v. Baggot,
 
 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983) and
 
 United States v. Sells Engineering, Inc.,
 
 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), is misplaced, the facts in those cases being distinct from those present here.
 

 Finally, the Raphans improperly seek to attack collaterally the 1972 order granting the government access to the documents. That order was entered in a proceeding to which the Raphans were not parties. The documents were not the Raphans’, and the Raphans were not targets of the grand jury. The Raphans thus had no standing to challenge the 1972 order directly and have no standing to challenge it here.
 
 Cf. United States v. Payner,
 
 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).
 

 CONCLUSION
 

 Accordingly, we affirm that part of the Claims Court’s judgment based on its holding that JBC was the agent of Associates but reverse that part of the judgment holding that no general partner had personal liability under the construction loan. That reversal requires that the limited partners, the Raphans, must be held disentitled to a step up in basis under Treas.Reg. Sec. 1.752(e).
 

 AFFIRMED-IN-PART, REVERSED-IN-PART.
 

 [1]
 

 . Benjamin Raphan was one of twelve partners in Tengran Company, which was in turn a limited partner in Enterprise Buchanan Associates (EBA). EBA was in turn a limited partner in Associates. EBA was also the sole stockholder of Virginia Tengran Corporation (Tengran Corp.), a general partner in Associates.
 

 [2]
 

 . All statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and as applicable in the years at issue.
 

 [3]
 

 . A general partner liable as partner for a partnership recourse debt is “personally liable" for that debt. However, a partnership creditor can reach the partner's assets only after exhausting its remedies against the partnership.
 
 See, e.g., May v. McGowan,
 
 194 F.2d 396, 397 (2d Cir.1952). The Pomponios “unconditionally" guaranteed the loan, and a creditor may therefore proceed against the Pomponios without first exhausting its remedies.
 
 See, e.g., Terry v. Tubman,
 
 92 U.S. (2 Otto) 156, 160, 23 L.Ed. 537 (1875). The Pomponios thus had a more direct, immediate liability for the loan than a general partner liable for a partnership debt. Acceptance of that more direct and immediate liability did not, as above indicated, mean that the guarantee was not undertaken in the Pomponios’ partnership capacity.
 

 [4]
 

 . Pursuant to Rule 6(e), a request for disclosure of grand jury documents must be directed to the appropriate district court. Here, the govern
 
 *887
 
 ment’s request had been directed to the United States District Court for the Eastern District of Virginia, where the grand jury was convened to investigate the Pomponios’ affairs. The request was granted on May 5, 1972.