Jesse C. BOLLINGER, Jr.; Edward H. Peter, Jr. and Mary H. Peter; Paul W. Hensley and Mary N. Hensley; Jesse C. Bollinger, Jr. and Suz-Anne Bollinger; Jesse C. Bollinger, Jr. and Jacqueline Bollinger; Jesse C. Bollinger, Jr. and Suz-Anne C. Bollinger, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 85–1825.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1986.

Decided Dec. 2, 1986.

Michael Paup (Lead Counsel), Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Dept. of Justice, Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Roger M. Olsen, Richard Farber, Teresa E. McLaughlin (argued), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.

Charles R. Hembree, Philip E. Wilson (argued), Kincaid, Wilson, Schaeffer & Hembree, P.S.C., Lexington, Ky., for petitioners-appellees.

Before ENGEL and NORRIS, Circuit Judges, and COHN, District Judge.*

NORRIS, Circuit Judge.

Respondent, Commissioner of Internal Revenue, appeals from orders of the United States Tax Court allowing to petitioners income tax deductions for losses generated by the construction and operation of apartment complexes.

Because the Tax Court made extensive findings of fact, the recitation of facts

---

* The Honorable Avern Cohn, United States District Judge, Eastern District of Michigan, sitting by designation.

which follows is a summary of those findings.

Petitioner, Jesse C. Bollinger, was a real estate developer who, both individually and in partnership with other petitioners, developed a number of apartment complexes in Kentucky. In order to obtain construction financing, financial institutions required that the nominal debtor be a corporate nominee of the sole proprietorship or partnership seeking the financing. Accordingly, record title to the various properties was held by a corporation as a device to comply with Kentucky law, which provided that lending money to a noncorporate borrower at the market rate of interest prevailing at the time in question was usurious.[1]

The circumstances surrounding Bollinger's development of Creekside North Apartments are typical of those related to the other developments. When he sought a construction loan and permanent financing for the project, he was advised by financial institutions that, in view of Kentucky usury laws, they would require that Bollinger's corporate nominee be the debtor and record titleholder. He obtained a commitment for permanent financing from Massachusetts Mutual Life Insurance Company, in which the company agreed to make a loan to "the corporate nominee of Jesse C. Bollinger, Jr."; the loan was to be secured by a mortgage on the apartments and by a personal guaranty from Bollinger.

After consulting with his accountant and attorney, Bollinger incorporated Creekside, Inc., for the sole purpose of having a corporate nominee for securing financing for the development of his apartment projects. He was the corporation's sole shareholder. Bollinger and Creekside, Inc., entered into an agreement which generally provided

1. The Tax Court developed a chart showing the apartment complexes constructed, the entities constructing them, the interest of the individuals in the various constructing entities, and the corporate nominee holding title:

| Apartment Complex | Partnership | Individual's Interest in the Partnership | | | | | | Title |
|---|---|---|---|---|---|---|---|---|
| | | Bollinger | Peter | Hensley | George Martin | Samuel Zell | Robert Laurie | |
| 1. Creekside North* | * | 100% | | | | | | Creekside. Inc.[1] |
| 2. Carriage Hill | Carriage Hill | 66⅔% | | 33⅓% | | | | Creekside, Inc. |
| 3. Creekside South | Creekside South | 50% | 50% | | | | | Creekside, Inc.. |
| 4. Les Chateaux | Les Chateaux | 33⅓% | 33⅓% | 33⅓% | | | | Creekside, Inc. (Sold Sept. 1971) |
| 5. Lamplighter | Lamplighter | 33⅓% | 33⅓% | 33⅓% | | | | Creekside, Inc. |
| 6. Two Lakes | Two Lakes: | | | | | | | |
| | 7/16/71–9/10/74 | 50% | | | | 50% | | Creekside, Inc. |
| | 9/10/74–2/6/75 | 2% | | | | 98% | | Howard Walker, Trustee |
| | After 2/6/75 | 0 | | | | 100% | | Howard Walker, Trustee |
| 7. Ski Lodge* | * | 100% | | | | | | Creekside, Inc. (Sold 1975) |
| 8. Cloister | Cloister | | | | | | | |
| | 7/15/73–1/4/74 | 50% | | | 50% | | | Cloisters, Inc.[2] (Until 12/31/74) |
| | 1/4/74–11/5/75 | 9½% | | | 9½% | 81% | | Greeland Vista, Inc.[3] |
| | After 11/5/75 | 0 | | | 0 | | 19% | (After 12/31/74) |

* Sole proprietorship

[1] Creekside, Inc. a Kentucky corporation wholly owned by Bollinger.
[2] Cloisters, Inc., a Kentucky corporation wholly owned equally by Bollinger and Martin.
[3] Greenland Vistas, Inc., a Delaware corporation in which petitioners had no interest.

that the corporation would hold title to Creekside North Apartments, as Bollinger's agent, only for the purpose of securing temporary and permanent financing of the project.

To finance construction of the apartments, Bollinger, through Creekside, Inc., borrowed the funds from Citizens Fidelity Bank and Trust Company. The corporation executed all the loan documents, and then transferred the loan proceeds to Bollinger's individual construction account.

Bollinger acted as general contractor during the construction of Creekside North Apartments, and costs of construction were paid from his construction account. Upon completion, Bollinger, through Creekside, Inc., obtained permanent financing from Massachusetts Mutual Life, with the loan being secured by a mortgage upon the apartments and a partial personal guaranty by Bollinger. The loan proceeds were used to pay off the construction loan from Citizens Fidelity.

The Tax Court also found that Bollinger intended to retain all but record title to the apartment complex; that he intended that the corporation would convey record title to him as soon as feasible; that no tax-avoidance scheme was present; and that, by incorporating Creekside, Inc., Bollinger sought none of the traditional insulating benefits of a corporate shareholder. Bollinger employed a resident manager to rent the apartments, execute leases, collect rents, and maintain operating records.

Operation of Creekside North Apartments generated losses in 1969, 1971, 1972, 1973, and 1974, and ordinary income in 1970, 1975, 1976, and 1977. Both the income and losses were reported by Bollinger on his individual income tax returns.

Pursuant to a substantially identical pattern, petitioners secured financing for the construction of the other apartment complexes through the use of a corporate nominee. Each partnership actively managed its apartment complex and reported income and losses on its partnership tax returns. Petitioners, in turn, reported their distributive shares of the partnership income and losses on their individual returns. Creekside, Inc., acted as corporate nominee for six of these projects, and Cloisters, Inc. (which was owned equally by Bollinger and another investor), as nominee for the seventh project. The lenders regarded Bollinger or the respective partnerships as the owners of the apartments, required partial personal guaranties from them, and looked to them for repayment. Creekside, Inc., and Cloisters, Inc., had no liabilities, assets, employees or bank accounts, nor did they manage the apartment complexes.

The Commissioner disallowed the loss deductions claimed by Bollinger and the other partners, taking the position that the losses were those of the corporation which held title to the real estate.

In siding with petitioners, the Tax Court held that they had clearly established that the corporations were acting as agents, and the losses were therefore attributable to the sole proprietorships or partnerships.

■ The manifest purpose of the income tax is to tax income to those persons or entities that earn or otherwise create the right to receive income and enjoy its benefit when paid. *Helvering v. Horst*, 311 U.S. 112, 119, 61 S.Ct. 144, 148, 85 L.Ed. 75 (1940); 26 U.S.C. §§ 1 and 11. Normally, the tax consequences of business transactions involving real property will fall upon its owner, since that is who customarily conducts the business and has the right to collect and enjoy the income. However, it does not follow that a nominal owner will be taxable, where there is transferred to him, as agent, the bare legal title, with the equitable owner retaining for himself the real and beneficial ownership.

The difficulty, in situations where the purported principal-equitable owner has an ownership interest in the corporation which holds nominal title, lies in determining whether there is a true agency relationship between the two, or whether there is such a kinship and similitude between the two, that the purpose of the income tax would be thwarted if an agency relationship were to be recognized. *See, e.g., Moline Proper-*

*ties, Inc. v. Comm'r of Internal Revenue,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).

The Supreme Court, in *National Carbide Corp. v. Comm'r of Internal Revenue,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), enunciated principles which are instructive in the resolution of this appeal. That case involved an arrangement, formalized by contract, where a parent corporation utilized its wholly owned subsidiaries as operating companies to manufacture and sell goods. Under the contract, the parent provided working capital, executive management, and office facilities to the subsidiaries, termed "agents," which, in turn, paid substantially all the profits from their manufacturing and sales operations to the parent. The Commissioner took the position that all the income turned over to the parent was taxable to the subsidiaries.

The Supreme Court sided with the Commissioner, disregarded the agency agreement, and noted that, under the circumstances of that case, the parent and subsidiaries operated with such oneness of purpose that the enterprise could as well have been conducted by a single corporate entity. 336 U.S. at 436, 69 S.Ct. at 733. Because the agency contract added nothing to the relationship which existed in fact, it could be disregarded so that the tax consequences might follow the reality of the circumstances.

However, the Supreme Court pointed out that this conclusion did not foreclose under all circumstances a "true corporate agent ... from handling the property and income of its owner-principal without being taxable therefor." 336 U.S. at 437, 69 S.Ct. at 734. Where generally recognized attributes of an agency relationship are present,[2] a controlled corporation can still be a true agent if its relations with its principal are not dependent upon the fact that it is owned by its principal, and its business purpose is the carrying on of the normal duties of an agent. *Id.* In other words, inquiry must be made whether the agent would have made the agreement if the principal were not its owner and, conversely, whether the principal would have undertaken the relationship if the agent were not its corporate creature. *See Harrison Property Management Co., Inc. v. United States,* 475 F.2d 623, 201 Ct.Cl. 77 (1973), *cert. denied,* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974).

Because one would not expect an independent agent to perform all the work and then turn over the profits to its principal, in exchange for only nominal compensation, it is readily apparent that the purported agency relationship in *National Carbide* could not have existed in the absence of ownership and control of the subsidiary.

By contrast, holding nominal title is the kind of task customarily undertaken by independent agents. Thus, it cannot be said that the agency relationship in this case was dependent upon the fact of common ownership and control, in the sense that in the absence of common ownership and control an agent would not assume the duty of holding nominal title, and a principal would not entrust that duty to an agent. A corporation unrelated to the principals could just as well have been entrusted to hold nominal title to avoid usury problems, while the principals retained the real and beneficial functions of property ownership.

The Tax Court observed that petitioners desired to operate their businesses either as sole proprietorships or partnerships, and were thwarted in completely doing so only by the practical requirement that they form corporations in order to comply with state usury laws. They did not attempt to avail themselves of the normal benefits of doing business in the corporate form; indeed,

---

**2.** The Supreme Court listed these attributes: Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists.
336 U.S. at 437, 69 S.Ct. at 734.

they conducted the businesses in individual and partnership capacities, remaining subject to the claims of creditors and others. Nor did they use the corporations as part of a tax-avoidance scheme. This is not, therefore, a situation where a taxpayer has embraced the advantages of doing business as a corporation and, so, in fairness, must be held to the burdens as well as the benefits of the corporate form.

Accordingly, the Tax Court did not err in finding that the attributes of a true agency relationship were present under the circumstances presented by this case, and the decision of the Tax Court is consistent with the Supreme Court's opinion in *National Carbide*.

■ As one might expect, the factual situation before us is not unique; it has been the subject of review by other Courts of Appeals. In a case involving similar facts, *Ourisman v. Comm'r of Internal Revenue*, 760 F.2d 541 (4th Cir.1985), the Fourth Circuit reversed a holding by the Tax Court that a corporate nominee was a true agent of the developer-partnership. In doing so, the court rejected the Tax Court's understanding that the requirement of *National Carbide*, that relations between the agent and principal must not be dependent upon the fact that the agent is owned by the principal, is satisfied where the corporate nominee acted no differently than an independent agent would have acted if the agent had bargained with its principal for its services at arm's length. Instead, the Fourth Circuit assigned a "literal" interpretation to that requirement, holding that the taxpayer's evidence must establish that the agency relationship was, in fact, an arm's length arrangement. This, in essence, is the position we are urged by the Commissioner to adopt. A similar result was reached in *Roccaforte v. Comm'r of Internal Revenue*, 708 F.2d 986 (5th Cir.1983), although that case is easily distinguishable on its facts.[3]

The Fourth Circuit's reading of the Supreme Court's requirement is subject to the criticism that it exalts form over substance, when the facts of that case are viewed in the context of the court's own characterization of its holding:

> Such a result simply recognizes the fact that if the agency relationship could not exist but for the shareholders' ownership and control of the corporate agent, the alleged agency relationship is nothing more than a manifestation of the underlying corporation-shareholder relationship and that the corporation therefore must be regarded as a separate taxpaying entity under our system of separate taxation of corporations.

760 F.2d at 549.

In our view, when the evidence establishes that the attributes of an agency are present, and the corporate nominee conducts itself no differently than would an independent agent which had bargained with its principal for its services at arm's length, then, even under the Fourth Circuit's "but for" test, a true principal-agent relationship has been proved. When the Supreme Court, in *National Carbide*, said that, under certain circumstances, a true corporate agent is not foreclosed from handling the property and income of its owner-principal without being taxable, it could not have contemplated so strict a reading of circumstances that, as a practical matter, the existence of a true agency would be foreclosed. What the Supreme Court de-

3. The Commissioner also relies upon an opinion of the Court of Appeals for the Federal Circuit as supporting its position [*Vaughn v. United States*, 740 F.2d 941 (Fed.Cir.1984)], but that case is also readily distinguishable upon its facts since, unlike the instant case, the activities of the purported corporate agent were inconsistent with a claim of agency. Moreover, in a later case, *Raphan v. United States*, 759 F.2d 879 (Fed.Cir.), *cert denied*, —— U.S. ——, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985), that same Court of Appeals affirmed a judgment of the Court of Claims which had held that a principal-agency relationship did exist, and approved a review by the trial court of the *National Carbide* factors which was strikingly similar to the review undertaken in this case by the Tax Court. *See Raphan v. United States*, 3 Cl.Ct. 457 (1983), *aff'd in part, rev'd in part*, 759 F.2d 879 (Fed. Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985).

manded was an inquiry into the actual substance of the relationship to determine if an agency existed in fact. Here, by any realistic assessment, the corporations acted like agents. When one surveys the circumstances of this case, one is hard-pressed to divine the harm which must be guarded against by adopting the Commissioner's position. Accordingly, we decline to follow the Fourth Circuit's view, as expressed in *Ourisman.*

The orders of the Tax Court are affirmed.